963 A.2d 316

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOHN
L. NYHAMMER, DEFENDANT–RESPONDENT.

Argued October 20, 2008—Decided February 3, 2009.

384

*Jeanne Screen,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Sylvia M. Orenstein,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Lawrence S. Lustberg* and *Jennifer Mara* submitted a brief on behalf of *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Gibbons,* attorneys).

Justice ALBIN delivered the opinion of the Court.

In this appeal, we first must determine whether the Fifth Amendment or our state-law privilege against self-incrimination compels the suppression of a statement by a person, who has voluntarily chosen to speak to the police after being fully advised

of his *Miranda* rights,[1] solely because the police did not inform him that he was a suspect. The trial court ruled that, based on the totality of the circumstances, defendant John Nyhammer knowingly, voluntarily, and intelligently waived his *Miranda* rights, even though the police did not give him advance notice that the questioning would touch on his own involvement in a sexual crime against his young niece. The Appellate Division reversed, finding that the police deprived defendant of essential information, his status as a suspect, necessary for the exercise of an informed waiver of his rights.

We now hold that the trial court properly applied the totality-of-the-circumstances test in deciding whether defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights—a test that we recently reaffirmed in *State v. O'Neill*, 193 *N.J.* 148, 936 *A.*2d 438 (2007), and *State v. Dispoto*, 189 *N.J.* 108, 913 *A.*2d 791 (2007). In applying that test, the trial court did not err in admitting defendant's confession. Here, defendant knew that he was a suspect as soon as the police asked him the first question about his involvement in the sexual abuse of the child-victim in this case. Moreover, one hour earlier, before defendant made his first incriminating statement, the police told him that he had a right to remain silent and that anything he said could be used against him in a court of law. Nevertheless, despite having been given his *Miranda* warnings, he knowingly and voluntarily chose to speak.

Next, we must decide whether the admission of the out-of-court statement by a child-victim denied defendant his federal and state right of confrontation because the child was, in large part, unresponsive to questioning on direct examination at trial. The Appellate Division reversed the trial court's admission of the child's statement on the ground that the child's silence made her, in effect, unavailable for cross-examination. Unlike the Appellate Division, we do not presume that the victim's unresponsiveness on

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

direct-examination made her "unavailable" on cross-examination. We hold that a defendant cannot assert that he was denied his right of confrontation unless he first attempts to cross-examine the witness on the core accusations in the case. Because defendant had the opportunity to cross-examine the child at trial about her out-of-court testimony implicating him in the crime but chose not to do so, he cannot claim that he was denied his right of confrontation.

I.

A Burlington County grand jury returned an indictment charging defendant John Nyhammer with first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2(a)(1) (count one), second-degree sexual assault, *N.J.S.A.* 2C:14–2(b) (counts two to five), and third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a) (count six). The victim of those crimes was defendant's nine-year-old niece, Amanda.[2]

### Defendant's Confession

The trial court conducted a pretrial *N.J.R.E.* 104(c) hearing to determine the admissibility of a confession made by defendant to Detective Michael Sperry of the Burlington County Prosecutor's Office and Detective Gabriele Willets of the Pemberton Township Police Department.[3] At the hearing, Detective Sperry, Detective Willets, and defendant testified to the events—most of which are undisputed—surrounding the interview now in question.

On September 24, 2001, Detective Sperry telephoned defendant and asked him whether he would be willing to discuss allegations that defendant's uncle, Glenn Green, had sexually abused his grand-niece, Amanda. Defendant, then twenty-eight-years old,

---

[2] Amanda is a pseudonym for the name of the child-victim in this case.

[3] *N.J.R.E.* 104(c) provides that "[w]here by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury."

expressed his willingness to speak with Detective Sperry. Indeed, defendant had previously reported to the Division of Youth and Family Services (DYFS) that his uncle had sexually abused Amanda. In their telephone conversation, Detective Sperry did not reveal to defendant that, several weeks earlier, Amanda had made statements to the police, alleging that both Green *and* defendant, on separate occasions, had sexually abused her.

As agreed, the next day, Detectives Sperry and Willets picked up defendant at a local restaurant and drove him to the Pemberton Township Police Department. Defendant had no other means of transportation. During the drive, the only talk between defendant and the detectives was idle chit-chat. On arriving at the police station at approximately 10:30 a.m., with Detective Willets as a witness, Detective Sperry read to defendant his *Miranda* rights:

You have the right to remain silent, [and] refuse to answer any question....

Anything you say may be used against you in a court of law....

You have the right to consult with an attorney at any time and have him present before and during questioning....

If you cannot afford an attorney one will be provided, if you so desire, prior to any questioning....

Your decision to waive these rights is not final and you may withdraw your waiver any time you wish, either before or during questioning.

Defendant orally acknowledged that he understood each right and also signed a *Miranda* warning card, which contained in writing each of the rights read to him. Detective Sperry began the interview with questions related to Green's relationship to defendant and Amanda. At that time, he did not mention Amanda's allegations directed at defendant.

At the beginning of the interview, defendant explained that, at about the age of ten, while he lived with Green and his wife, his uncle had physically abused him. Defendant also mentioned that during a two-year period "he had basically raised" Amanda and her cousin when they were young children. Defendant then agreed to be interviewed on audiotape.

During a seventeen-minute audiotape interview, defendant recalled that in 1998, when Amanda was six-years old, he observed Green touch and squeeze Amanda's buttocks and rub her inner thigh. He reported the incidents to DYFS, but was told by DYFS that charges could not be brought because Amanda "refuse[d] to talk." Additionally, defendant suspected that Green sexually abused one of his own daughters. Defendant left for Colorado in April 1998, and when he returned to this state in January 1999, Amanda would "not [say] two words to [him]" or even speak to others while he was in the room. That taped interview ended at 11:27 a.m.

Afterwards, Detective Sperry expressed his concern that "Green may have sexually abused [defendant]," at which point "[defendant's] eyes filled up with tears." Although defendant denied that his uncle had sexually abused him, he began to shift his eyes downward when Detective Sperry said "that sometimes victims of sexual abuse exhibit sexually abusive behavior." It was then, for the first time, that Detective Sperry mentioned that Amanda had made sexual allegations about defendant and "described everything that he had done to her." Crying, defendant admitted "that he messed up a few months before." He explained that he became "sexually excited" when Amanda had given him a hug and that he put her hand on his erect penis.

Defendant agreed to give another audiotape statement, which began at 11:56 a.m. and ended at 12:24 p.m. During the taped statement, defendant expanded on his description of his sexual encounter with Amanda in a bedroom. After Amanda placed her hand on his penis for "a second or two," he then masturbated, ejaculating in front of the child. At defendant's request, Amanda had lowered her pants, and he had rubbed his fingers on her vagina, penetrating her slightly with a finger. Defendant described the depth of the penetration with his finger as no greater than the length of a pencil eraser. He also acknowledged that his penis might have "accident[ally]" rubbed up against Amanda's

vagina. Immediately afterwards, defendant told Amanda: " 'This is between me and you ... this will never happen again at all.' "

Defendant claimed that this sexual episode occurred within approximately a five-minute period, and that he then left the house for two days and "wanted to kill [himself]." Nevertheless, defendant admitted that Amanda observed him masturbating between ten and twenty times. After making the confession, defendant stated, "I feel better now that it's out."

In his testimony, defendant stated that he gave a false confession to the detectives, that the abuse he described inflicting on Amanda had actually occurred to him as a child, and that he merely substituted their names in giving his account. He claimed that he was trying to get some help for Amanda and "asking for help for [himself] too." He noted that he graduated from a high school for emotionally disturbed children. Defendant conceded that, during the questioning, the detectives were polite and respectful, did not raise their voices, did not threaten him, and treated him "like a human being." The detectives did not offer and he did not ask for either a drink or a bathroom break. At 2:00 a.m. on the day of the interview, defendant had taken pain medication for an arm injury, but could not say that he was affected by the medication or that the pain was unmanageable. Detective Sperry turned off the tape recorder six to eight times, advising defendant during the intervals of what Amanda had told Detective Cooper.

Defendant stated that Detectives Sperry and Willets did not tell him that he was a suspect before he went to police headquarters to give a statement about his uncle, Glenn Green. During his testimony, however, defendant conceded that he understood his *Miranda* rights when those rights were read to him by Detective Sperry. Moreover, at his trial, defendant testified that he knew when he gave the second audiotape statement that he had a right to refuse to answer the questions, but nevertheless kept answering because he "would have said or done anything to help Amanda."

The court ruled that, based on the totality of the circumstances, Detectives Sperry and Willets did not violate defendant's *Miranda* rights and that defendant "voluntarily and intelligently" waived his rights when he consented to be interviewed. The court rejected defendant's arguments that the detectives had an obligation to re-administer the *Miranda* warnings before questioning defendant about his sexual misconduct with Amanda and that the earlier warnings preceding the questioning about Green did not suffice because defendant did not know at that time that he was a suspect. It noted that, despite his educational background, defendant showed during the hearing that he "had the capacity to act knowingly and intelligently." The court reasoned that it did not have to determine whether defendant was in custody because he was given his *Miranda* rights. In determining defendant's statements to be voluntary, the court emphasized that the nature of the questioning was not coercive; that "the length of the questioning [was] not substantial"; and that "[defendant] testified . . . that he understood his rights." Whether defendant's confession was false was a matter for the jury.

### Amanda's Videotape Interview

The court also conducted a pretrial *N.J.R.E.* 104(a) hearing to determine the admissibility of Amanda's eighty-two-minute video-tape interview with Detective Dawn Cooper of the Burlington County Prosecutor's Office on September 10, 2001.[4] Throughout the interview, Amanda was reticent and not easily forthcoming, and Detective Cooper questioned the child, many times pointedly, with leading questions. Amanda identified defendant by writing the name "Uncle John" on a board.[5] Using a drawing of a female body, Amanda indicated that defendant touched her in the vaginal

---

[4] *N.J.R.E.* 104(a) provides that "[w]hen . . . the admissibility of evidence . . . is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge."

[5] At trial, Detective Cooper testified that she did not have any information indicating defendant might have been involved in the sexual abuse of Amanda until Amanda wrote the name "Uncle John" on the board.

area and on the buttocks and, with the assistance of dolls, indicated that defendant partially penetrated her vagina with his finger. She also responded that defendant had touched her with his fingers and penis. Amanda demonstrated, with up-and-down hand motions, how defendant stroked his penis, stating that when defendant "squeeze[d]" his penis, "white stuff" landed on the floor and that he "clean[ed] it up with a tissue paper." When the[ʲ] detective asked Amanda the direction defendant's "wee wee [was] pointing when he [squeezed it]," Amanda answered that he "[m]akes it face up . . . [t]o the sky."

Without objection, the videotape and a transcribed statement of the interview were admitted into evidence.

### Trial

A six-day jury trial began on April 2, 2003. The prosecutor called as his first witness, Amanda, then eleven years old. Amanda answered preliminary questions with some ease, giving her age and identifying her school and the family members and pets with whom she lived. The prosecutor, however, encountered great difficulty in drawing from Amanda the information contained in her videotape statement. Amanda recalled speaking to Detective Cooper "a long time ago" about what happened, but was not responsive in giving details. When asked to tell "who [she] talked about," she did not respond. After the court allowed Amanda to write down her answer on a board, she printed the words, "Uncle John," and then recited the name out loud.

Although the prosecutor struggled to elicit answers from Amanda, the young girl stated that she told the truth when she spoke with Detective Cooper, and that she told the detective "about certain things that happened between" her and defendant, even though it was "hard." However, when asked "if Uncle John touched [her] anywhere," Amanda did not respond. When that same or similar type of question was asked several different times, she remained incommunicative. Amanda also would not respond to the question of whether "anybody ever touched [her] on [her] private areas."

On cross-examination, defense counsel asked a number of safe questions—questions intended to elicit answers that would reveal only mundane information, rather than information that might damage or, even worse, implicate her client.[6] Counsel questioned Amanda on such topics as her age, her school, and her relatives and pets. When asked whether she recalled telling Detective Cooper about what happened, Amanda could not give details. Counsel highlighted Amanda's non-responsiveness on direct-examination with such inquiries: "[W]hen [the prosecutor] asked you did Uncle John touch you, you didn't answer him. Do you remember that?", and "Do you remember telling [Detective Cooper] about anybody else touching you?" To both questions, Amanda answered, no.

Following Amanda's testimony, the trial court again heard arguments concerning the admissibility of her videotape interview with Detective Cooper. Defense counsel now objected to the videotape's admission on the ground that it did not meet an essential component of the "tender years" hearsay exception, *N.J.R.E.* 803(c)(27), which requires a judicial finding that on "the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy." Counsel contended that Amanda's inability to recall or corroborate her videotape interview rendered her out-of-court statements untrustworthy and therefore inadmissible under *N.J.R.E.* 803(c)(27).

The trial court, however, held that there was a probability that the statement was trustworthy based on the following factors: Amanda had no motive to lie, Amanda used dolls and drawings to answer questions and had sufficient knowledge of the human body to understand and answer the detective's questions; and her answers to the detective's questions were reasonably spontaneous despite the leading nature of the questions. The court found that *N.J.R.E.* 803(c)(27)'s preconditions for admission of Amanda's out-

---

[6] In making that observation, we do not suggest, in any way, that the strategic course pursued by counsel was not well calculated to advance the defense.

of-court-statements were met-the videotape interview was trust-worthy, the defense had adequate notice that the tape would be offered as evidence, and Amanda testified.

For the defense, defendant's sister-in-law and fiancée both testified that defendant enjoyed a healthy and normal relationship with children. Carol Price, defendant's former principal at a residential treatment center and self-described "adopted mother," explained that she had observed defendant, in stressful situations, admit his guilt to authorities for acts he did not commit or for which he was not entirely culpable.

Last, in his testimony, defendant repeated, in large part, what he had said at the pretrial hearing, averring that he falsely implicated himself "trying to get Amanda help" from the abuse inflicted on her by Glenn Green and was "willing to even say or do anything" to achieve that goal. Significantly, for purposes of this appeal, defendant admitted on direct examination that he understood his constitutional rights when he spoke to the police concerning Amanda's allegations about him:

Defendant: I was informed from Detective Sperry that there [were] accusations from Amanda towards me.

Defense counsel: Did you know that you had a right to refuse to answer any questions?

Defendant: Yes, I do—did.

. . . .

Defense counsel: Did you know that you had a right to refuse to answer any questions at the time of the second tape?

Defendant: Yeah.

Defense counsel: But you kept answering questions?

Defendant: Correct.

On April 11, 2003, the jury returned a verdict of guilty on all six counts of the indictment. The trial court sentenced defendant to a term of eighteen years in state prison, with a nine-year period of parole ineligibility, for aggravated sexual assault (count one) and to a concurrent term of seven years imprisonment for sexual assault (count five). All the remaining counts were merged into the aggravated-assault conviction. Additionally, the court advised

defendant that, under Megan's Law, he was subject to community supervision for life, *N.J.S.A.* 2C:43–6.4, and required to register as a sex offender, *N.J.S.A.* 2C:7–2, and to submit DNA samples for the sex offender registry.

### Appeal

The Appellate Division reversed defendant's conviction on two grounds. *State v. Nyhammer*, 396 *N.J.Super.* 72, 78, 932 *A.*2d 33 (App.Div.2007). First, the panel determined that "defendant did not make a knowing and voluntary waiver of his right to remain silent" when confronted by Detective Sperry with Amanda's allegations. *Id.* at 85, 932 *A.*2d 33. The panel acknowledged that ordinarily a valid waiver of *Miranda* rights continues until revoked, and therefore the police have no duty to repeat the required warnings. *Id.* at 83, 932 *A.*2d 33. The panel also acknowledged that "the contents of [the *Miranda* warnings] inherently may suggest that the recipient of the warning could be a criminal suspect." *Id.* at 84, 932 *A.*2d 33. Nevertheless, because Detective Sperry "initially [led] defendant to think that his interview was about Green's culpability, [and] not his own," the panel concluded that when defendant acquired knowledge that he was a suspect "and that his personal liberty would be affected by his conversation with Sperry, the *Miranda* warnings should have been given again." *Ibid.* Detective Sperry's failure to repeat those warnings at that critical point rendered defendant's confession "involuntary" under both the Due Process Clause of the Fourteenth Amendment of the United States Constitution and this state's common-law privilege against self-incrimination. *Id.* at 84–85, 932 *A.*2d 33. Therefore, the panel suppressed defendant's confession. *Id.* at 85, 932 *A.*2d 33.

Second, the appellate panel held that the admission of Amanda's videotape interview, which constituted "the sole substantive evidence" of defendant's guilt in light of the suppression of his confession, violated the Confrontation Clause of both the federal and state constitutions. *Id.* at 86–90, 932 *A.*2d 33. The panel reasoned that because Amanda's out-of-court statements to the

police were "testimonial" in nature, those statements were inadmissible unless Amanda was available for cross-examination at trial or "'unless [Amanda] was unavailable to testify and the defendant had had a prior opportunity for cross-examination.'" *Id.* at 87–89, 932 *A.*2d 33 (quoting *Crawford v. Washington,* 541 *U.S.* 36, 54, 124 *S.Ct.* 1354, 1365, 158 *L.Ed.*2d 177, 194 (2004)). The panel determined that "[Amanda's] complete inability to present current beliefs about any of the material facts, or to testify about her prior statements," *id.* at 89, 932 *A.*2d 33, effectively denied defendant the "opportunity for an adequate and meaningful cross-examination at trial," *id.* at 90, 932 *A.*2d 33. For that reason, and because defendant had no prior opportunity to cross-examine Amanda, the panel found that the trial court erroneously admitted the videotape interview into evidence. *Id.* at 90, 932 *A.*2d 33. The panel therefore ordered a new trial. *Ibid.*

We granted the State's petition for certification, 193 *N.J.* 586, 940 *A.*2d 1219 (2008), and the motion of the Association of Criminal Defense Lawyers of New Jersey to participate as *amicus curiae.*

## II.

We first address whether the Appellate Division erroneously suppressed defendant's confession. The State submits that the only true issue is whether defendant knowingly and voluntarily waived his *Miranda* rights. Because the trial court made findings that defendant did so, after a consideration of the totality of the circumstances, the State urges that the appellate panel should have deferred to those findings. The State notes that this Court in *Dispoto, supra,* rejected a *per se* rule that pre-custodial *Miranda* warnings must be read again when a suspect is placed in custody. The State also relies on United States Supreme Court precedent to support its position that nothing in *Miranda* intimates that the police are required to inform a person under interrogation of his status as a suspect. The State therefore urges that we reverse the Appellate Division.

Defendant agrees with the Appellate Division that he could not effectively waive his *Miranda* rights until he was informed that he was a suspect. That is so, he argues, because until he knew of his status as a suspect, he could not appreciate the significance of the *Miranda* warnings or the consequences of the waiver of his rights. Accordingly, defendant submits that the police were obliged to read to him again the required warnings at the critical moment when they would have been meaningful to him.

In support of defendant's arguments, the Association of Criminal Defense Lawyers of New Jersey, *amicus curiae*, cites several of this Court's cases as authority for the proposition that the police withheld from defendant essential information—his status as a suspect—and therefore rendered defendant incapable of making a valid waiver of his rights.

### III.

The issue before this Court is whether federal and state law requires that, in addition to being advised of his *Miranda* rights, a person under police interrogation be informed that he is a suspect or that he be re-read his rights when the subject of the questioning may incriminate him. We begin with a discussion of the rationale underlying *Miranda* and the federal constitutional and state common-law right against self-incrimination.

### A.

The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, *N.J.S.A.* 2A:84A–19, and evidence rule, *N.J.R.E.* 503. *See U.S. Const.* amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself...."); [7] *N.J.S.A.* 2A:84A–19 ("[E]very natural

---

[7] The Fifth Amendment right against self-incrimination has been made applicable to the States through the Due Process Clause of the Fourteenth Amend-

person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate...."); *N.J.R.E.* 503 (same as *N.J.S.A.* 2A:84A–19).

█ In the landmark case of *Miranda v. Arizona*, the United States Supreme Court imposed safeguards to ensure that an individual would have a meaningful opportunity to exercise his right against self-incrimination when subject to police interrogation, whether in custody at the stationhouse or any other place where he is "deprived of his freedom of action in any significant way." 384 *U.S.* 436, 477, 86 *S.Ct.* 1602, 1629, 16 *L.Ed.*2d 694, 725 (1966). To counteract the inherent psychological pressures in a police-dominated atmosphere that might compel a person "to speak where he would not otherwise do so freely," the Court mandated that a person subject to a custodial interrogation "must be adequately and effectively apprised of his rights." *Id.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719. The Court prescribed a set of warnings that must be given to a person in police custody before interrogation begins. The person must be told

[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

[*Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726.]

The fifth requirement is that a person must be told that he can exercise his rights at any time during the interrogation.[8] *Ibid.* The burden is on the prosecution to demonstrate not only that the individual was informed of his rights, but also that he has know-

---

ment. *Malloy v. Hogan,* 378 *U.S.* 1, 8, 84 *S.Ct.* 1489, 1493–94, 12 *L.Ed.*2d 653, 659 (1964).

[8] The Court mandated the giving of those warnings "unless other fully effective means are adopted to notify the person of his right of silence." *Miranda, supra,* 384 *U.S.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726. The *"Miranda* [warnings have] become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States,* 530 *U.S.* 428, 443, 120 *S.Ct.* 2326, 2336, 147 *L.Ed.*2d 405, 419 (2000).

ingly, voluntarily, and intelligently waived those rights, before any evidence acquired through the "interrogation can be used against him." [9] *Ibid.*

## B.

The crux of this case is whether defendant knowingly, voluntarily, and intelligently waived his right against self-incrimination when he confessed to sexually abusing Amanda. Defendant contends that his confession should be deemed involuntary because, in addition to giving the *Miranda* warnings, the police must inform a person, at the outset of any questioning, that he is a suspect (if indeed he is a suspect) or read again the *Miranda* warnings after questioning begins when he becomes a suspect. Here, Detective Sperry informed defendant of his *Miranda* rights, but not that he was a suspect when the questioning began, and did not repeat the *Miranda* warnings when the questioning focused on defendant's sexual abuse of Amanda.

■ Generally, barring intervening events, "[o]nce a defendant has been apprised of his constitutional rights, no repetition of these rights is required." *State v. Melvin,* 65 *N.J.* 1, 14, 319 *A.*2d 450 (1974). In *Melvin,* the police issued *Miranda* warnings to the defendant before administering an unstipulated polygraph test to him. *Id.* at 6, 319 *A.*2d 450. After the test, the defendant made incriminating statements. *Ibid.* We explained that in those circumstances the police were not required to repeat the warnings. *Id.* at 14, 319 *A.*2d 450. We applied the same principle in *State v. Magee,* in which the police gave *Miranda* warnings to an interrogated defendant, but did not repeat the warnings two-and-a-half days later when the defendant, while in custody, voluntarily came

---

[9] Under state law, at a *N.J.R.E.* 104(c) hearing, the prosecution bears the burden of proving beyond a reasonable doubt that a defendant's waiver was made knowingly, voluntarily, and intelligently, *see State v. Presha,* 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000), whereas under federal law, the government must "prove waiver only by a preponderance of the evidence," *Colorado v. Connelly,* 479 *U.S.* 157, 168, 107 *S.Ct.* 515, 522, 93 *L.Ed.*2d 473, 485 (1986).

forward to make inculpatory statements. 52 *N.J.* 352, 372–74, 245 *A.*2d 339 (1968). In those circumstances, we refused to "adopt an automatic second-warning system," explaining that "the important factors" in determining the validity of a *Miranda* waiver are "whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished." *Id.* at 374, 245 *A.*2d 339 (citation and internal quotation marks omitted).

In determining the voluntariness of a defendant's confession, we traditionally look to the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion. *See State v. Presha,* 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000). In the totality-of-the-circumstances analysis, we consider such factors as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." *Ibid.* (citation and internal quotation marks omitted).

We recently reaffirmed our adherence to the totality-of-the-circumstances approach in *State v. Dispoto,* 189 *N.J.* 108, 913 *A.*2d 791 (2007), and *State v. O'Neill,* 193 *N.J.* 148, 936 *A.*2d 438 (2007). In *Dispoto,* the police served a domestic violence temporary restraining order and search warrant on the defendant, who was read his *Miranda* warnings even though he was not in custody at that time. 189 *N.J.* at 116, 913 *A.*2d 791. More than an hour later, defendant was arrested when he surrendered to the police a .38 caliber Colt revolver, which he claimed to have won in a poker game. *Ibid.* The police did not repeat the *Miranda* warnings to the defendant immediately after he was taken into custody, and he continued to make other incriminating statements. *Id.* at 117, 913 *A.*2d 791.

We rejected a bright-line rule that would have required the suppression of a defendant's statements whenever the police do not repeat *Miranda* rights—initially given in the pre-custodial stage—to a defendant after he is taken into custody. *Id.* at 124,

913 *A*.2d 791. Instead, we held that "fact-based assessments" under a totality-of-the-circumstances approach was the proper way to decide whether a defendant voluntarily waived his rights. *Id.* at 124–25, 913 *A*.2d 791. We concluded that when

> pre-custodial warnings have been given to a defendant as part of a continuing pattern of interactions between the defendant and the police, and during that continuing sequence of events nothing of an intervening nature occurs that would dilute the effectiveness of the warning that had been given, then there would appear to be no need to require that another warning be given.
>
> [*Ibid.*]

In *O'Neill,* we applied the totality-of-the-circumstances approach to the " 'question-first, warn-later' interrogation procedure," in which the police first question a suspect in custody without the benefit of *Miranda* warnings and, after eliciting incriminating statements, then issue *Miranda* warnings and resume questioning for the purpose of eliciting incriminating statements admissible at trial. 193 *N.J.* at 154–55, 179–80, 936 *A*.2d 438. We held "that when *Miranda* warnings are given *after* a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." *Id.* at 180–81, 936 *A*.2d 438. In *O'Neill,* we specifically eschewed a bright-line rule and instead followed a traditional multi-prong test requiring a consideration of all relevant factors. *Id.* at 181, 936 *A*.2d 438.

Only in the most limited circumstances have we applied a *per se* rule to decide whether a defendant knowingly and voluntarily waived *Miranda* rights. In *State v. Reed,* we held that *Miranda* waivers are invalid under our state-law privilege against self-incrimination when police officers knowingly fail to inform a suspect that an attorney is present or available to confer with him. 133 *N.J.* 237, 261–62, 269, 627 *A*.2d 630 (1993). Withholding information that an attorney is outside the interrogation room, we reasoned, directly denies the suspect his right to counsel, which, in turn, diminishes his capacity to exercise his privilege against self-

incrimination. *Id.* at 262, 627 *A.*2d 630. Because of the important role counsel plays in protecting the rights of the accused, deterring law enforcement officers who would keep an attorney from his client did not lend itself to a multi-factor test. We highlighted the limited extent of the bright-line rule in *Reed* by noting that "[t]he duty to inform, that we place upon the State, is narrow and specific." *Id.* at 263–64, 627 *A.*2d 630.

In *State v. A.G.D.*, we also held, again under our state-law privilege against self-incrimination, a *Miranda* waiver *per se* invalid when the police who were questioning the defendant withheld from him the fact that they had in hand a criminal complaint and warrant for his arrest.[10]  178 *N.J.* 56, 68, 835 *A.*2d 291 (2003). We noted that "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden ... that the suspect has exercised an informed waiver of rights." *Ibid.*

In determining whether defendant voluntarily waived his *Miranda* rights, there are no compelling reasons for us to substitute the traditional totality-of-the-circumstances test for an inflexible, *per se* rule. The facts in this case are in no way comparable to those in *Reed*, in which the police were involved in a purposeful effort to deny the defendant his right to the assistance of counsel, patently undermining one of the essential *Miranda* rights.

This case also is easily distinguishable from *A.G.D.* The issuance of a criminal complaint and arrest warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual. The defendant in *A.G.D.* was purposely kept in the dark by his

---

[10] In addition to setting the federal constitutional standard, *Miranda* has "play[ed]" an important role in enhancing and safeguarding our state law privilege," and remains "a strong force in the development of our decisional law." *O'Neill, supra,* 193 *N.J.* at 168, 936 *A.*2d 438. At times, we have found that our state-law privilege against self-incrimination "offers broader protection than its federal counterpart under the Fifth Amendment." *State v. Muhammad,* 182 *N.J.* 551, 568, 868 *A.*2d 302 (2005). *Reed* and *A.G.D.* are two such examples.

interlocutors of this indispensable information. Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers. A suspect to one police officer may be a person of interest to another officer. Moreover, we emphasized that "[o]ur holding [in *A.G.D.*] is not to be construed as altering existing case law ... other than imposing the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued." 178 *N.J.* at 68–69, 835 *A*.2d 291.

Most closely on point is *State v. Roach*, 146 *N.J.* 208, 680 *A*.2d 634 (1996). There, we upheld a trial court's finding that, based on the totality of the circumstances, the defendant made a knowing, voluntary, and intelligent waiver of his *Miranda* rights despite his apparently mistaken belief that he was giving an exculpatory statement as a witness. *Id.* at 226, 680 *A*.2d 634. The defendant in that case claimed that the police "deceiv[ed] him into believing that they sought his statement only as a witness and not as a defendant." *Ibid.* In ultimately concluding that the defendant's statement was the product of an essentially free and unconstrained will, we reiterated that "[a] determination of voluntariness depends on an evaluation of the totality of all the surrounding circumstances." [11] *Id.* at 227, 680 *A*.2d 634 (citation and internal quotations omitted).

Accordingly, we do not find that the facts here fall within the limited category of cases in which we have applied a bright-line rule. Having said that, however, we still must determine whether the failure to advise an individual that he is a suspect at the time he is read his *Miranda* warnings should be a factor in the totality-of-the-circumstances test.

---

[11] We also noted that not every promise made to a defendant will necessarily render his statement involuntary, but that we must look to the totality of the circumstances. *Roach, supra,* 146 *N.J.* at 227, 680 *A*.2d 634.

## C.

Significantly, we are not aware of any case in any jurisdiction that commands that a person be informed of his suspect status in addition to his *Miranda* warnings or that requires automatic suppression of a statement in the absence of a suspect warning. The essential purpose of *Miranda* is to empower a person—subject to custodial interrogation within a police-dominated atmosphere—with knowledge of his basic constitutional rights so that he can exercise, according to his free will, the right against self-incrimination or waive that right and answer questions. *Miranda, supra,* 384 *U.S.* at 456–57, 86 *S.Ct.* at 1618–19, 16 *L.Ed.*2d at 713–14. The defining event triggering the need to give *Miranda* warnings is custody, not police suspicions concerning an individual's possible role in a crime. *See Oregon v. Mathiason,* 429 *U.S.* 492, 495, 97 *S.Ct.* 711, 714, 50 *L.Ed.*2d 714, 719 (1977) ("[P]olice officers are not required to administer *Miranda* warnings ... because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"); *Beckwith v. United States,* 425 *U.S.* 341, 346–47, 96 *S.Ct.* 1612, 1616, 48 *L.Ed.*2d 1, 7–8 (1976) ("It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning." (citation and internal quotation marks omitted)).

Under federal law, a knowing, voluntary, and intelligent waiver of *Miranda* rights is not dependent on a person being told that he is a suspect in a particular criminal investigation. In *Colorado v. Spring,* the defendant claimed that the failure of the police "to inform him of the potential subjects of interrogation" amounted to "trickery and deception" and "render[ed] his waiver of *Miranda* rights invalid." 479 *U.S.* 564, 575, 107 *S.Ct.* 851, 858, 93 *L.Ed.*2d 954, 966 (1987). The United States Supreme Court held in *Spring* that "a suspect's awareness of all the possible

subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.* at 577, 107 *S.Ct.* at 859, 93 *L.Ed.*2d at 968. The Court emphasized that *Miranda* does not require that "the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights" because "the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 576–77, 107 *S.Ct.* at 859, 93 *L.Ed.*2d at 967 (citation and internal quotation marks omitted). Thus, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision." *Id.* at 576, 107 *S.Ct.* at 859, 93 *L.Ed.*2d at 967.

Although "evidence that the accused was threatened, tricked, or cajoled into a waiver" of his privilege will render the waiver involuntary, *Miranda, supra,* 384 *U.S.* at 476, 86 *S.Ct.* at 1629, 16 *L.Ed.*2d at 725, according to the United States Supreme Court, "[o]nce *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right," *Spring, supra,* 479 *U.S.* at 576, 107 *S.Ct.* at 858, 93 *L.Ed.*2d at 967.

In the typical case, explicit knowledge of one's status as a suspect will not be important for *Miranda* purposes. However, explicit knowledge of one's suspect status, in some unusual circumstance, might be a useful piece of information in exercising a waiver of rights under our state-law privilege against self-incrimination. Nevertheless, the failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances. We must acknowledge the reality that in many, if not most, cases the person being questioned knows he is in custody on a criminal charge. We also are mindful that the *Miranda* warnings themselves strongly suggest, if not scream out, that a person is a suspect, *i.e.,* "You have the right to remain silent ... [and a]nything you say may be used against you in a court of law." Those and the other warnings should be a

sobering wake-up call to a person under interrogation. Last, the nature of police questioning will be another stark reminder that the person under interrogation is deemed a suspect. For example, there can be little doubt that when Detective Sperry told defendant that Amanda had made sexual allegations against him that he knew—at that moment—that he was a suspect in a criminal investigation.

We now turn to the application of the totality-of-the-circumstances test to determine whether the trial court abused its discretion in finding that defendant made a valid waiver of his *Miranda* rights.

### D.

■ When defendant arrived at the police station, based on his earlier conversation with Detective Sperry, defendant believed that he would be questioned about Glenn Green's alleged sexual abuse of Amanda. At 10:39 a.m., when defendant was read and acknowledged his understanding of his *Miranda* rights, Detective Sperry was silent about his intention to question defendant about his own involvement with Amanda. Whether defendant was in custody at that moment is not significant; at worst, he was read his rights before it was necessary to do so. Because disputes often arise over exactly when a defendant was deemed to be in custody—the triggering point requiring the administering of *Miranda* warnings—police officers out of an abundance of caution will advise a defendant of his rights at the earliest stage in an interrogation. We find it difficult to fault that approach. *See Dispoto, supra,* 189 *N.J.* at 124–25, 913 *A.*2d 791.

The questioning of defendant concerning Green lasted from approximately 10:39 a.m. to 11:27 a.m., which included giving an audiotape statement. After the conclusion of that recorded statement, Detective Sperry alerted defendant to the allegations made by Amanda against him. Therefore, less than an hour after receiving his *Miranda* rights, defendant was confronted with the allegations that he had sexually abused his niece. Neither at his

pretrial *Miranda* hearing nor at trial did defendant testify that he did not have an understanding of his right to remain silent in response to Detective Sperry's questions. Indeed, defendant testified that he knew that he "had a right to refuse to answer any questions" concerning Amanda's accusations, even when Detective Sperry began the second audiotape statement, which dealt exclusively with that subject. That second audiotape statement began at 11:56 a.m. and ended at 12:24 p.m. The whole interview process lasted under two hours.

Significantly, the questioning that preceded the inquiry into defendant's relationship with Amanda was conducted in accordance with *Miranda*, unlike the scenario in *O'Neill*, in which the initial questioning was conducted without the benefit of *Miranda* warnings and the incriminating statements elicited were used to exploit a confession after *Miranda* warnings were later given. *See O'Neill, supra*, 193 *N.J.* at 155, 936 *A.*2d 438. We must defer to the factual findings made by the trial court, which concluded that defendant's answers to questions showed that he had the intellectual capacity to understand the nature of his rights and to exercise those rights and that there was an absence of coercive tactics throughout the interrogation. *See State v. Elders*, 192 *N.J.* 224, 243–44, 927 *A.*2d 1250 (2007) (stating that when there is sufficient credible evidence in record to support trial court's findings, appellate court "should give deference to those findings" (citation and internal quotation marks omitted)). The trial court heard testimony from defendant, who conceded that he was treated with respect and that no threats were made toward him. Last, the court noted that the interrogation was not substantial in length.

In view of the totality of the circumstances, the court held that defendant "voluntarily and intelligently waived" his rights. Because the court applied the correct legal test and its findings are supported by sufficient credible evidence in the record, we cannot conclude, as did the Appellate Division, that there was an abuse of discretion. Defendant's confession was properly admitted into

evidence, and therefore we are compelled to reverse the Appellate Division.

## IV.

### A.

With regard to the admission of Amanda's videotape statements implicating defendant, we begin by noting that the only challenge before us is whether the Appellate Division erred in determining that those statements violated defendant's federal and state right of confrontation. The issue before us is not whether Amanda's statements satisfied the requirements of the "tender years" exception to the hearsay rule, *N.J.R.E.* 803(c)(27).[12] Although Amanda's videotape interview was admitted into evidence without objection after a pretrial *N.J.R.E.* 104 hearing, the trial court nevertheless entertained defendant's objections to its admission following Amanda's trial testimony. The court specifically found that the State had satisfied the three criteria for admission of Amanda's hearsay statements under *N.J.R.E* 803(c)(27): (1) the State gave defendant adequate notice of its intention of introducing the videotape interview, (2) Amanda's statements had sufficient indicia of trustworthiness, and (3) Amanda testified. In concluding that Amanda's out-of-court statements ran afoul of the Confrontation Clause, the Appellate Division "assum[ed] that the

---

[12] *N.J.R.E.* 803(c)(27) provides:

A statement made by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

judge's decision on trustworthiness [was] supported by the proofs, [and that Amanda's] statement[s met] the requirements for admission set by *N.J.R.E* 803(c)(27)." *Nyhammer, supra,* 396 *N.J.Super.* at 86, 932 *A.*2d 33.

We granted the State's petition for review of the Appellate Division's holding that Amanda's statements violated the Confrontation Clause. Defendant did not cross-petition challenging the trial court's admission of Amanda's videotape interview under *N.J.R.E* 803(c)(27). Nonetheless, we have independently reviewed Amanda's videotape interview and conclude that the trial court did not abuse its discretion in finding that her statements met the trustworthiness requirement of *N.J.R.E* 803(c)(27).

Tellingly, in her videotape interview nine-year-old Amanda gave details of the sexual abuse she suffered at the hands of defendant—her "Uncle John." With the help of drawings and dolls, Amanda indicated that defendant had touched her vagina and buttocks, and penetrated her with his finger. She demonstrated how defendant had masturbated in her presence, stroking and squeezing his penis until "white stuff [would] come[ ] out of it," which he then cleaned up. She also responded that defendant touched her with his penis. Amanda exhibited sexual knowledge beyond the experience of a typical child of similar age. *See State v. J.G.,* 261 *N.J.Super.* 409, 421, 619 *A.*2d 232 (App.Div.), *certif. denied,* 133 *N.J.* 436, 627 *A.*2d 1142 (1993) (finding infant victims' out-of-court statements concerning sexual abuse "trustworthy" because "they disclosed a sexual knowledge beyond the ken of a young child").

Those statements directly implicating defendant are of significant importance to our constitutional analysis because Amanda took the stand and defendant had the opportunity to cross-examine her. We now turn to the confrontation issue.

### B.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of our State Constitution both

provide a criminal defendant with "the right to . . . be confronted with the witnesses against him." *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. "That right embodied in the Confrontation Clause expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination." *State ex rel. J.A.,* 195 *N.J.* 324, 342, 949 *A.*2d 790 (2008). The Sixth Amendment "prohibit[s] the use of out-of-court *testimonial* hearsay, untested by cross-examination, as a substitute for in-court testimony." *Ibid.* (discussing *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004)). Based on *Crawford,* there is no question that Amanda's videotape statement—given to a law enforcement officer investigating a crime—constitutes testimonial hearsay for Sixth Amendment purposes. *See Crawford, supra,* 541 *U.S.* at 68, 124 *S.Ct.* at 1374, 158 *L.Ed.*2d at 203 ("Whatever else the term [testimonial hearsay] covers, it applies at a minimum to . . . police interrogations."); *see also Davis v. Washington,* 547 *U.S.* 813, 822, 126 *S.Ct.* 2266, 2273–74, 165 *L.Ed.*2d 224, 237 (2006) (holding that statements are testimonial when made in course of police interrogation under circumstances "objectively indicat[ing] that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" and not to enlist "police assistance to meet an ongoing emergency").

"[T]he Confrontation Clause places no constraints at all on the use of [a witness's] prior testimonial statements," provided that "the [witness] appears for cross-examination at trial." *Crawford, supra,* 541 *U.S.* at 59 n. 9, 124 *S.Ct.* at 1369 n. 9, 158 *L.Ed.*2d at 197 n. 9. In other words, the "[Confrontation] Clause does not bar admission of a statement so long as the [witness] is present at trial to defend or explain it." *Ibid.* However, "[t]estimonial statements of witnesses absent from trial [are] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59, 124 *S.Ct.* at 1369, 158 *L.Ed.*2d at 197.

The Appellate Division held that Amanda's "complete inability" to detail at trial "any of the material facts" of the sexual abuse and

her inability "to testify about her prior statements" meant that defendant had "no opportunity for an adequate and meaningful cross-examination at trial." *Nyhammer, supra,* 396 *N.J.Super.* at 89–90, 932 *A.2d* 33. For that reason, and because defendant also had no prior opportunity to cross-examine Amanda, the Appellate Division concluded that the admission of the videotape statement violated the principles enunciated in *Crawford. Id.* at 90, 932 *A.2d* 33.

■ We now hold that the admission of Amanda's videotape statement did not violate either the federal or state Confrontation Clause. Although defendant had the opportunity to cross-examine Amanda on the core allegations contained in that statement, he declined to do so at trial. However unresponsive Amanda may have been on direct-examination, as contended by defendant, he had the opportunity to question her on the inculpatory statements and descriptions she gave in her taped interview. It is "irrelevant that the reliability of some out-of-court statements cannot be replicated, even if the [witness] testifies to the same matters in court." *Crawford, supra,* 541 *U.S.* at 59 n. 9, 124 *S.Ct.* at 1369 n. 9, 158 *L.Ed.*2d at 197 n. 9 (citation and internal quotation marks omitted).

Here, defense counsel questioned Amanda about an array of subjects, none of which directly confronted her claims in the videotape statement. Counsel asked Amanda about her age, her school, and her relatives, and also asked other safe questions, such as, "[W]hen [the prosecutor] asked you did Uncle John touch you, you didn't answer him. Do you remember that?", and "Do you remember telling [Detective Cooper] about anybody else touching you?" Defense counsel could have asked Amanda, using leading questions, "Is it true that your Uncle John never touched your private parts and never touched or stroked his own private parts in your presence?" This example is merely illustrative and is not intended to suggest the many different and varied ways in which defense counsel may conduct cross-examination for confrontation purposes.

Nevertheless, defense counsel chose not to cross-examine Amanda about the core accusations in the taped interview, perhaps for good reason, fearing that such questioning might have elicited the type of damning responses that eluded the prosecutor on direct-examination. That counsel decided to forgo critical cross-examination because of Amanda's unresponsiveness to many questions on direct does not mean that defendant was denied the opportunity for cross-examination. Had counsel directly confronted Amanda on her claims on cross-examination and had she remained completely silent or unresponsive, then we would have a record on which to decide whether her silence or unresponsiveness effectively denied defendant his constitutional right of confrontation. *See Douglas v. Alabama*, 380 *U.S.* 415, 419–20, 85 *S.Ct.* 1074, 1077, 13 *L.Ed.*2d 934, 937–38 (1965) (holding that admission of out-of-court statement inculpating defendant by witness who refused to testify after invoking his Fifth Amendment privilege denied defendant ability to cross-examine and therefore violated his Sixth Amendment right of confrontation). We cannot presume that Amanda would have remained silent or unresponsive to questions defense counsel never asked. *See generally R.* 1:7–2 and –3 (setting forth how issues are to be preserved for appeal).

We do not fault defense counsel for not pursuing cross-examination that may have damaged defendant's case. Having chosen that strategic course, however, defendant cannot now claim that he was denied the opportunity for cross-examination. Quite simply, defendant has not made out the fundament for a constitutional challenge under the Confrontation Clause of either the Sixth Amendment or Article I, Paragraph 10 of our State Constitution. Therefore, we reverse the Appellate Division, concluding that the trial court did not abuse its discretion in placing before the jury Amanda's videotape interview.

## V.

For the reasons expressed, we hold that the trial court did not err in finding that, based on the totality of the circumstances,

defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights under both federal and state law. Accordingly, the trial court did not abuse its discretion in admitting defendant's confession. We also hold that defendant has not made out a claim that Amanda's videotape out-of-court statements were admitted in violation of his right of confrontation guaranteed by both the federal and state constitutions. We therefore reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand to the Appellate Division for consideration of the unresolved issues raised by defendant's challenge to his sentence.

Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.