**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4388-18T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMAL WADE, a/k/a
JAMAL WILLIAMS,

    Defendant-Appellant.

_____

          Submitted October 21, 2020 – Decided November 23, 2020

          Before Judges Alvarez and Geiger.

          On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 17-02-0125.

          Bruno & Ferraro, attorneys for appellant (John Latoracca, of counsel and on the brief).

          Gurbir S. Grewal, Attorney General, attorney for respondent (Amanda G. Schwartz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendants Jamal Wade and Gyasi Allen were charged with murder and related offenses for the fatal shooting in Paterson of Cosmeik Gee on September 30, 2016. Wade appeals: the September 20, 2018 order determining that his statement to police was admissible at trial; a September 24, 2018 order determining that the testimony of the State's historical cell-site analysis expert regarding the location of Wade's cell phone was admissible at trial; and an April 29, 2019 amended judgment of conviction. We affirm.

We discern the following facts from the record. At around 11:43 p.m. on September 30, 2016, a dark-colored Audi sedan pulled out from the intersection of William Street and Twelfth Avenue in Paterson and stopped next to Gee's vehicle. Several shots were fired into Gee's car, fatally wounding him.

While investigating the shooting, Paterson Police Department (PPD) detectives viewed several surveillance videos, eventually recovering footage from a neighborhood liquor store that captured the faces of two men they believed were involved. Footage taken by a city camera at the intersection of East Twenty-Second Street and Twelfth Avenue recorded the victim walking toward his vehicle, which was parked west of East Twenty-Third Street on Twelfth Avenue, and a dark-colored Audi sedan pull out from the intersection of William Street and Twelfth Avenue and stop next to the victim's vehicle. A

A-4388-18T4

man wearing a black jacket, a gray hooded sweatshirt, gray pants, and black shoes exited the front passenger door and fired several shots into the victim's vehicle. The shooter re-entered the sedan, and the vehicle sped off, traveling northwest on Twelfth Avenue and turning right onto East Twenty-Second Street. A detective identified Wade as the driver of the sedan and Allen as the passenger and shooter. The court granted the State's motion to admit the identification at trial.

Detectives recovered additional footage from the area. The footage showed the sedan traveling north on Twenty-Second Street for several blocks from 11:47 to 11:48 p.m. that night and passing several buildings along East Twenty-Second Street and Tenth Avenue before disappearing from view.

The State Police Auto Theft Task Force (Task Force) conducted a large-scale investigation into automobile theft in Paterson and surrounding areas. As part of the investigation, the Task Force obtained a September 20, 2016 communications data warrant (CDW) authorizing installation of a signal monitoring and GPS tracking device to "allow members of the New Jersey State Police, the New Jersey Division of Criminal Justice, and members of any law enforcement agencies assigned to this investigation ('the participating law enforcement agencies'), to instantly and continuously track the position and location of [a black 2012 Audi A6]" with New Jersey registration number

H76GUD, for thirty days. The CDW was authorized to identify individuals engaged in the crimes of Receiving Stolen Property, Fencing-Dealing in Stolen Property, Theft by Unlawful Taking, and Conspiracy to commit those crimes. The CDW stated that any "information obtained pursuant to the Warrant [could] be disclosed to members of the participating law enforcement agencies, as well as any other law enforcement officer who may be assigned to participate in [the] investigation."

After hearing that a dark-colored sedan was involved in the Paterson shooting, Detective Sergeant Vittorio Flora of the Task Force reviewed the GPS data and learned that the Task Force had been tracking a stolen dark-colored 2012 Audi A6 sedan that was parked near the scene of the shooting at the time it occurred Flora provided the PPD detectives with GPS data and tracking sheets recovered pursuant to the CDW that showed the vehicle's travel path after it departed from William Street.

After locating the stolen Audi A6, PPD detectives recovered surveillance footage from the area. From the videos obtained, they observed the Audi A6 traveling west on Seventh Avenue and parking at 11:52 p.m. at the location where it was recovered. Two men exited the vehicle—the driver wearing a gray hooded sweatshirt with a black line across the front, gray sweatpants, and black shoes, and the passenger wearing a black jacket, a light-colored hood

underneath, gray sweatpants, and dark shoes. The passenger wiped the exterior door handles with a cloth, which he then placed in a white duffle bag, before following the driver toward East Sixteenth Street. The men turned south onto East Sixteenth Street and then east onto Eighth Avenue.

After reviewing the videos, the team returned to the Detective Bureau, and lead Detective Anthony Petrazzuolo began examining the GPS tracking sheets. He determined that the Audi A6 had been parked at 451 East Twenty-Fourth Street from about 8:39 p.m. until 10:54 p.m. on the night of the shooting, so the team decided to visit the area to locate additional footage. The footage did not show the exact location of the vehicle, but it did show that around 8:39 p.m., two men were walking south on East Twenty-Fourth Street—one wearing the same clothing as the driver of the Audi A6, and the other wearing all black clothing—and then turned west onto Tenth Avenue.

The team visited a liquor store near the corner of Tenth Avenue and East Twenty-Second Street. Footage obtained from the liquor store suggested that one of the men arriving at the scene was the driver of the Audi A6. Detective Jimmy Maldonado reviewed the footage and determined that the driver who entered the liquor store was Wade.

Later in the footage, at around 10:47 p.m., a dark-colored Honda sedan pulled up in front of the liquor store, and a man who appeared to be wearing

the same clothing as the passenger/shooter exited the vehicle. A local Paterson man identified him as Allen. Wade and Allen then walked east on Tenth Avenue, entered a minivan, and exited the minivan after a short period of time; at about 10:51 p.m., the camera captured the men turning onto East Twenty-Fourth Street, where the Audi A6 was parked.

On October 3, 2016, Maldonado spotted Wade in front of a convenience store on Tenth Avenue. The detectives stopped and exited their vehicle. After confirming his identity, Petrazzuolo drew his weapon, placed Wade in hand restraints, seized two cell phones, and told him he was under arrest for murder. The gun that was used in this case was never recovered. A marked patrol car transported Wade to the Detective Bureau for an interview.

Petrazzuolo and Maldonado took Wade's videotaped statement. Wade was not handcuffed during the twenty-minute interview. A redacted version was played for the jury.

First, Petrazzuolo said, "So, we told you why you're here," and Wade agreed and nodded his head. Then, Petrazzuolo read Wade his Miranda[1] rights from a rights and waiver form. The rights read to Wade included:

> You have the right to remain silent. Anything you say
> can be used against you in a court of law. You have
> the right to speak to an attorney for advice before we

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

ask any questions. Also, you have the right to have a lawyer with you during any questioning. If you cannot pay for the service of a lawyer, a lawyer will be appointed to represent you without cost before any interrogation. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You also have the right to stop answering questions at any time until you speak to a lawyer.

Wade watched the detective as he spoke and nodded his head several times.

Wade orally confirmed he understood "each and every one of those rights," then wrote his answers to the questions on the <u>Miranda</u> form and signed it. Petrazzuolo next read aloud the waiver of rights section of the form:

I have read my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and nobody has used pressure or force of any kind against me.

Petrazzuolo then said, "So, if you want to speak to us, you're going to have to waive your rights." The following exchange then occurred:

MR. WADE: I have a lawyer, though.

DET. PETRAZ[Z]UOLO: You have a lawyer?

MR. WADE: Yeah.

DET. PETRAZ[Z]UOLO: So you want a lawyer?

MR. WADE: I got a lawyer. I don't -- yeah, let me talk to him.

DET. MALDONADO: Does he have a lawyer for something else or you --

MR. WADE: He's paid for everything. I got a case in Delaware, a case here. He's paid for everything

DET. MALDONADO: Oh, okay.

DET. PETRAZ[Z]UOLO: All right, so you—you don't want to speak to us without your lawyer; is that what you're saying?

MR. WADE: There's nothing to be mad at, I'm a man.

DET. PETRAZ[Z]UOLO: All right, well you're going to have to wait to speak --

MR. WADE: Yeah, but I got a lawyer. So you said I'm under arrest, right?

DET. MALDONADO: No, I didn't say you're under arrest.

MR. WADE: You just read me my rights.

DET. MALDONADO: If you -- He hasn't been charged with anything --

DET. MALDONADO: (indiscernible)

DET. PETRAZ[Z]UOLO: You haven't been charged with anything yet.

Mr. WADE: So then talk. I don't need to tell you shit if I ain't under arrest. I know I ain't do nothing wrong.

DET. PETRAZ[Z]UOLO: Are you . . . verbally agreeing to speak to us?

MR. WADE: Yeah, I'm a man.

8
A-4388-18T4

DET. PETRAZ[Z]UOLO: Without your lawyer here?

MR. WADE: (indiscernible). He knew you.

DET. PETRAZ[Z]UOLO: Are you verbally agreeing to speak to you without your lawyer?

MR. WADE: Yeah, verbally. (indiscernible) I think you think I'm stupid, 'cause I got --

DET. MALDONADO: I don't think you're stupid. I'm just saying that you said --

MR. WADE: You saying the only way you need a lawyer is I'm under arrest, and I'm not under arrest, I can talk to anybody, the judge, the fucking mayor, whoever.

DET. MALDONADO: All right, Jamal.

During this exchange, Wade signed the waiver section of the Miranda form, acknowledging that he waived his rights.

The detectives questioned Wade about what he was doing the night the victim was shot. Wade told them he was drinking at the liquor store with some neighborhood people, and he stayed there until 2 a.m. Around midnight that night, he learned the victim had been shot while in a bad part of the neighborhood. He also told the detectives that he was wearing an all gray outfit, with a hat and black belt. When Petrazzuolo asked Wade to identify an image of a man's profile, Wade confirmed it was him. According to

A-4388-18T4

Petrazzuolo, the image was a still shot photograph derived from the liquor store surveillance footage.

The detectives then told Wade they knew he was lying about being at the liquor store until 2:00 a.m. based on footage from surveillance cameras in the area. They told him the cameras showed that around 10:30 p.m., he was walking near Twenty-Third Street and Tenth Avenue and then to Twenty-Fourth Street. There, he got into an Audi, drove first to William Street, then to Twelfth Avenue between Twenty-Second and Twenty-Third Streets, where a passenger exited the Audi and shot the victim. Wade was later observed near Fifteenth Street and Seventh Avenue.

Petrazzuolo told Wade, "[A]ll you can do at this point is help yourself," but Wade claimed the detectives were telling "fabricated stories" and requested to speak to his lawyer because "[t]his just got bad." Maldonado continued to speak with Wade, explaining that "[o]ut of respect" for him, they "put it all out there," so Wade would understand what they already knew about his connection to the shooting. Wade briefly responded but requested his lawyer again after the detective told him, "We know you didn't do it by yourself." The detectives ceased questioning Wade at that point and ended the interview. Wade was then formally charged and booked. Petrazzuolo prepared the criminal complaint.

10

Detective David Posada of the Passaic County Prosecutor's Office obtained a CDW for Wade's iPhone and related T-Mobile account records. Posada sent the CDW to T-Mobile. T-Mobile provided a call log and cell site data detailing which towers Wade's iPhone communicated through during those calls. The call log showed that Wade's iPhone had been used during the relevant hours.

The call log, cell site data, and GPS tracking data were sent to the Federal Bureau of Investigation's (FBI) Cellular Analysis Survey Team (CAST) for historical cell-site analysis. FBI Special Agent Agit David, a member of CAST assigned to the FBI's Technical Operations Division in Newark, was responsible for real-time cellular phone location and historical cell-site analysis.

David analyzed the historical cell site data for Wade's T-Mobile account to determine whether Wade's iPhone was used in the general area of the shooting and travel path of the Audi A6 at the approximate time of the crime. He was also asked to determine if the cell site data was consistent with the GPS data the Task Force had obtained. In addition, he performed drive tests[2]

---

[2] To perform a drive test, a person drives or walks around the streets or paths in a particular area and carries a radio scanner that collects data about the frequencies transmitted from a cell phone tower in that area. The data shows the effective coverage for a particular cell phone tower, which encompasses

during July 2018 to provide a more accurate analysis of the coverage area of a particular cell site.

David focused on three calls of interest that were made at 11:49 p.m., 11:51 p.m., and 11:54 p.m. on the night of the shooting. David created a map for each of the three calls. The maps showed the cell tower that handled the call, the extent of the coverage for that cell site and sector, the effective coverage for that site and sector, the dominant coverage area, and the GPS tracker information—all in relation to the crime scene. Based on this information, David determined the cell dominant phone coverage was consistent with Wade's iPhone being present at GPS-derived locations of the Audi A6 during the three calls. He also determined that the drive test data confirmed that the coverage of the cell site could include at least some points along the GPS tracker. The GPS data, in turn, showed the Audi A6 was parked in the area of the shooting just before it occurred and the vehicle's travel path after it departed.

A Passaic County grand jury returned an indictment charging Wade with: second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count one); first-degree purposeful or knowing murder, N.J.S.A. 2C:11-

each location that a user can receive and make phone calls. However, a drive test cannot identify a cell phone's exact location; it can only identify that a cell phone was in a particular area when being serviced by a certain tower.

3(a)(1), (2) (count two); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a) (count three); fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count five); and third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) and 2C:20-2(b)(2)(b) (count six). The indictment charged Allen with the offenses set forth in counts one, two, three, and five.

The Miranda Hearing

Before trial, the State moved to allow admission of Wade's statement to the Paterson detectives during its case-in-chief. The court conducted a Rule 104 hearing. After the State played the recording of Wade's statement, Petrazzuolo testified that he did not threaten or force Wade to give a statement and did not make any promises to Wade. He also confirmed that Wade was not formally charged until after the interview. Petrazzuolo described Wade as "pretty calm" and mostly cooperative during the interview, other than when he made statements that contradicted what the detectives observed on the surveillance videos.

Detective Maldonado briefly explained his involvement in Wade's arrest and in taking Wade's statement. He explained that he misspoke when he told Wade he was not under arrest. He "meant to say that [Wade] hadn't been

charged with anything" because usually when individuals make a statement, they ask if they have been charged. After Wade responded to Maldonado's statement that he was not under arrest, Maldonado told him he had not been charged yet.

The court found that Wade voluntarily and knowingly waived his Miranda rights and ruled that Wade's statement was admissible at trial. While the court acknowledged it was arguable that Wade's waiver was "somewhat equivocal," the court found it significant that: Wade had previous encounters with law enforcement; the detectives advised him of all his rights; the detention was brief; the time between the reading of his rights and his statement was brief; Wade's statement was likewise brief; and the detectives did not prolong the questioning or subject Wade to physical or mental abuse. The court found Maldonado's misstatement that Wade was not under arrest was immaterial, because even if not truthful, Wade "understood what was going on."

The Motion to Suppress the GPS Data

On the first day of trial, Wade moved to suppress the GPS data and tracking sheets that Paterson detectives obtained from the Task Force. Following oral argument and a review of the CDW, the court denied defendant's motion to suppress the GPS data and tracking sheets. The court

concluded that common sense dictated that when the lead "agency authorized by the CDW . . . contacts another agency, that's part of the investigation." Eventually, Wade was charged with receiving stolen property, one of the crimes listed in the CDW, which the judge found to be a further "indication of the nexus between the State Police contacting . . . the Paterson Police Department and then Paterson Police in turn using that information to one of the charges that is common [to] both." The court found there was "no [CDW] violation under the circumstances."

The Trial

During the ten-day joint trial, the State called fourteen witnesses, including Petrazzuolo, Maldonado, Flora, Posada, David, Pagano, and forensic scientist Brett Hutchinson. The State's witnesses did not provide a motive for the homicide. Neither defendant testified nor did they call any witnesses.

Wade's statement was played for the jury. The jury was also presented with two photos taken from the liquor store video and signed by Wade. The photos were of Wade's face, and during his statement, Wade agreed that the person depicted in both photos was him

State Police Detective Sergeant Clinton Pagano testified that his duties with the auto theft task force were to "investigate high[-]end motor vehicle thefts and try and develop cases against theft crews and individuals stealing

15                                                                    A-4388-18T4

motor vehicles." In his affidavit in support of the application for the CDW, Pagano requested that the State Police be permitted: "to disclose the requested search warrants and communications data warrants as well as the supporting affidavit filed in this matter to members of the New Jersey Attorney General's Office as well as other law enforcement agencies who are assisting the New Jersey State Police." Pagano testified that he believed it was permissible to turn over the information to "law enforcement involved in any investigation."

The court recognized David as an expert in historical cell-site analysis without objection. David provided the jury with detailed information explaining how he performed the cell site analysis. We need not repeat his comprehensive testimony as Wade does not contest the validity of the cell-site analysis in this appeal.

David opined that the cell site records for Wade's iPhone could coincide with the GPS coordinates and that the drive test "further confirm[ed] that the coverage for that particular cell site could include at least some points along that GPS tracker." When then asked whether it was still his opinion that Wade's iPhone "could have aligned with the GPS coordinates," David replied: "Yes, it's possible." Considering all the GPS and cell tower data, David concluded "that the phone could have been located with [the Audi A6] at the time that these calls were made."

16

The jury found Wade guilty on all counts.[3]  At sentencing, the trial court dismissed count four and merged counts three and five into count two.  Wade was sentenced to an aggregate forty-year term, subject to a thirty-four-year period of parole ineligibility and a five-year period of mandatory parole supervision under the No Early Release Act, N.J.S.A. 2C:43-7.2.  Count two ran consecutively to any sentence defendant was already serving.  This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE STATE'S MOTION TO ADMIT DEFENDANT'S STATEMENT DURING ITS CASE-IN-CHIEF SHOULD HAVE BEEN DENIED BECAUSE THE POLICE NEVER INFORMED DEFENDANT OF THE CHARGES HE WAS FACING, AND THEY LIED WHEN THEY INFORMED HIM THAT HE WAS NOT UNDER ARREST; PURSUANT TO STATE V. A.G.D.,[4] JAMAL WADE'S WAIVER OF HIS RIGHT AGAINST SELF-INCRIMIMATION WAS NOT VALID AND THEREFORE HIS STATEMENT SHOULD HAVE BEEN SUPPRESSED.

POINT II

THE EVIDENCE GARNERED FROM THE GPS TRACKER ON THE STOLEN AUDI SHOULD NOT

---

[3]  The jury found Allen guilty of counts one through three and five.

[4]  State v. A.G.D., 178 N.J. 56 (2003).

HAVE BEEN ADMITTED INTO EVIDENCE BECAUSE IT WAS SUPPLIED TO THE PATERSON POLICE IN DIRECT CONTRAVENTION OF A COURT ORDER, AND ITS ADMISSION AT TRIAL DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

A.

We first address the admissibility of Wade's statement to police. Relying on A.G.D., Wade contends that he did not make a knowing and voluntary waiver of his right against self-incrimination because Maldonado and Petrazzuolo did not inform him of the nature of the charges against him or that he had been arrested. 178 N.J. 56. He asserts they materially misrepresented that he was not under arrest, which he claims was the basis for agreeing to waive his rights. The State contends that the detectives did not violate A.G.D. because neither an arrest warrant nor a criminal complaint had been issued before Wade gave his statement. Ibid. The State further argues that, even if the court did err, it was harmless because there was overwhelming evidence of Wade's guilt and because Wade's single admission during his statement did not lead to an unjust verdict.

We are guided by the following well-established legal principles. When reviewing "a trial court's admission of police-obtained statements," we "engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Maltese, 222 N.J. 525, 543 (2015)

(quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). "We do not independently assess evidence as if we are the trial court." Ibid. (citing Hreha, 217 N.J. at 382). Rather, we "typically defer to the trial court's credibility and factual findings." Hreha, 217 N.J. at 382. Such "findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Tillery, 238 N.J. 293, 314 (2019) (quoting State v. A.M., 237 N.J. 384, 395 (2019)). "However, we owe no deference to conclusions of law made by lower courts in suppression decisions, which we instead review de novo." State v. Boone, 232 N.J. 417, 426 (2017) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

The record demonstrates that Petrazzuolo advised Wade of the full panoply of his Miranda rights before subjecting him to custodial interrogation. Petrazzuolo also advised Wade of the need to waive those rights before questioning could begin. Wade confirmed both verbally and in writing that he understood his Miranda rights.

If the suspect consents to proceed with the interrogation, his rights must be "voluntarily, knowingly and intelligently" waived. Miranda, 384 U.S. at 444; State v. Hartley, 103 N.J. 252, 261 (1986). Any evidence obtained in violation of Miranda must be suppressed at trial. Hartley, 103 N.J. at 262.

The record fully supports the trial court's conclusion that Wade voluntarily and knowingly waived his <u>Miranda</u> rights and agreed to answer questions.

Whether a defendant invoked the right to remain silent is determined under the totality of the circumstances. <u>Maltese</u>, 222 N.J. at 545. If the suspect invokes the right to remain silent, that invocation must be "scrupulously honored." <u>Hartley</u>, 103 N.J. at 255-56 (citing <u>Michigan v. Mosley</u>, 423 U.S. 96 (1975)). If the invocation is ambiguous, the officer may only ask clarifying questions about whether he or she meant to invoke the right to remain silent. <u>State v. Johnson</u>, 120 N.J. 263, 283 (1990) (citations omitted).

An ambiguous invocation can arise where a subject refuses to respond to questioning for a prolonged period and has made statements that "convey[] an unwillingness to respond to any questions." <u>Id.</u> at 285. An ambiguous invocation of the right to remain silent must be clarified before authorities can proceed to question a suspect. <u>State v. S.S.</u>, 229 N.J. 360, 384, 386 (2017).

Where the totality of the circumstances demonstrates that the defendant exercised his right to remain silent or to counsel, whether ambiguously or unambiguously, the <u>Hartley</u> bright line rule requires <u>Miranda</u> warnings to be readministered. <u>Hartley</u>, 103 N.J. at 267. Here, Wade did not exercise his right to remain silent, to speak to an attorney, or to have an attorney present

during questioning at any point during the interview, either ambiguously or unambiguously.

In A.G.D., the police had obtained an arrest warrant for the defendant before interviewing him. 178 N.J. at 59. The Court held that a Miranda waiver is per se invalid when police withhold the fact that a criminal complaint has been filed against the suspect or a warrant has been issued for his arrest. 178 N.J. at 68. Here, neither of those events had yet occurred.

In State v. Vincenty, 237 N.J. 122, 134 (2019), the Court reaffirmed its holding in A.G.D. There, the police sought to question Vincenty about an attempted robbery and attempted murder. Id. at 126-27. After obtaining a signed Miranda waiver, detectives began questioning Vincenty; it was not until later in the interview that they showed him a list of the charges that had already been filed against him. Id. at 127-28. The Court concluded that "Vincenty's interrogation is precisely what A.G.D. prohibits." Id. at 134. It held that because Vincenty was not informed by police of the charges filed against him until after he signed the waiver, he was deprived of "critically important information" and could not have knowingly and voluntarily waived his right against self-incrimination. Id. at 135. These facts are clearly distinguishable.

A-4388-18T4

The facts in this case are similar to those in State v. Nyhammer, 197 N.J. 383 (2009). There, the Court considered whether Nyhammer could knowingly and voluntarily waive his right against self-incrimination where the police failed to inform him that he was a suspect. Id. at 387-88. The police asked Nyhammer if he was willing to discuss allegations that his uncle had sexually abused Nyhammer's minor niece. Id. at 389. The police did not inform Nyhammer that the victim had also made similar allegations against him. Id. at 390. Nyhammer agreed to speak with the detectives, and after being read his Miranda rights, he agreed to waive them. Id. at 389-90. After discussing the allegations about Nyhammer's uncle, the detective informed Nyhammer of the allegations against Nyhammer. Id. at 391. Nyhammer then confessed to sexually abusing his niece. Id. at 391-92.

The Court declined to adopt a per se rule to determine whether Nyhammer's waiver was valid. Id. at 404. In so holding, it distinguished the matter from A.G.D.:

> The issuance of a criminal complaint and arrest warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual. The defendant in A.G.D. was purposely kept in the dark by his interlocutors of this indispensable information. Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that

will vary depending on subjective considerations of different police officers.

[Id. at 404-05.]

The Court concluded:

In the typical case, explicit knowledge of one's status as a suspect will not be important for Miranda purposes. However, explicit knowledge of one's suspect status, in some unusual circumstance, might be a useful piece of information in exercising a waiver of rights under our state-law privilege against self-incrimination. Nevertheless, the failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances.

[Id. at 407.]

The Court was "mindful that the Miranda warnings themselves strongly suggest, if not scream out, that a person is a suspect," and this "should be a sobering wake-up call to a person under interrogation." Id. at 407-08.

We discern no error in admitting Wade's statement at trial. Wade had not yet been charged or indicted when interviewed. When the detectives located Wade, however, Petrazzuolo drew his weapon, placed Wade in handcuffs, and told him he was under arrest for murder. Wade was then transported to the Detective Bureau in a marked police car, advised of his Miranda rights, and interviewed in a locked room at the Detective Bureau. These circumstances "screamed out" that Wade was a suspect in the homicide

and under arrest. Moreover, this was not Wade's first encounter with police or arrest.

At one point during the interview, Wade asked: "So you said I'm under arrest, right?" Maldonado immediately responded: "No, I didn't say you're under arrest." Maldonado then accurately told Wade: "He hasn't been charged."

The record fully supports the findings that Wade: knew he was a suspect for the murder; understood his Miranda rights; voluntarily, knowingly and intelligently waived those rights; did not exercise his rights to remain silent, to speak to an attorney, or have one present; and gave a voluntary statement to the detectives. Accordingly, the trial court properly determined that Wade's statement to police was admissible.

B.

We next address Wade's argument that the trial court erred in denying his motion to suppress the GPS data that Paterson detectives obtained from the State Police. Wade contends the GPS data was inadmissible because it was obtained pursuant to a CDW issued for the sole purpose of investigating automobile theft and related offenses. Wade asserts that the trial court erred in allowing the State to use the GPS data for a purpose not expressly stated in the warrant because the PPD was not involved in the automobile theft

24  A-4388-18T4

investigation, was not designated as one of the "participating agencies" in the CDW, and used the GPS data for an unrelated purpose.

The State counters that the sharing of information between different law enforcement agencies is not unlawful. In addition, since Wade was charged with one of the crimes described in the CDW, the State Police did not exceed the scope of the CDW when it shared the GPS data with the PPD.

"We review the trial court's evidentiary ruling under a deferential standard; it should be upheld 'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). A reviewing court applying this deferential standard "should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling is so wide of the mark that a manifest denial of justice results." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Defendant does not challenge the validity of the CDW and concedes he lacked standing to challenge the GPS tracker on the stolen car he was driving on the night of the homicide. The State Police lawfully acquired the GPS data from the tracking device installed on the stolen Audi A6 pursuant to the CDW. The CDW limited the use of the tracker to identifying the vehicle's location

and travel; there is no evidence that the tracker identified a wider range of information.

We have recently recognized that "[t]he circumstances here are no different than one law enforcement agency shares information relevant to an ongoing investigation with another law enforcement agency in order to assist in the apprehension of a suspect." State v. Jackson, 460 N.J. Super. 258, 274-75 (App. Div. 2019) (citing Phila. Yearly Mtg. of Religious Soc'y of Friends v. Tate, 519 F.2d 1335, 1337-38 (3d Cir. 1975)) (noting that the sharing of information among law enforcement agencies for a legitimate law enforcement purpose is only impermissible if the initial gathering of that information was unlawful). Here, the installation of the tracking device and resulting acquisition of GPS data were carried out pursuant to a valid CDW.

More fundamentally, the CDW was issued to identify individuals engaged in the crime of receiving stolen property. Wade was charged with and convicted of receiving stolen property for traveling to and departing from the scene of the shooting in the stolen Audi A6. Consequently, the PPD was a "participating" law enforcement agency in the Task Force's auto theft investigation as defined by the CDW.

As noted by the trial court, it would "defy common sense" to conclude that the police were required to overlook what they believed might be evidence

related to the homicide, merely because homicide was not a crime enumerated in the CDW, when a stolen vehicle being tracked via GPS by the Task Force was used as the getaway vehicle. As we similarly concluded in State v. Jackson, "the circumstances here are no different than when one law enforcement agency shares information relevant to an ongoing investigation with another law enforcement agency in order to assist in the apprehension of a suspect." 460 N.J. Super. 258, 273 (App. Div. 2019), aff'd o.b., 241 N.J. 547 (2020).

We discern no error. The trial court properly denied Wade's motion to suppress the GPS data.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-4388-18T4