**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2238-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMEEL N. JONES,
a/k/a NAIM MCKINLEY,
MARVIN CAMPBELL,
JAMIL JONES,
JAMIL N. MCKINLEY,
and JAMIL WILLIAMS,

     Defendant-Appellant.

_____

Submitted April 6, 2022 – Decided September 23, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 18-09-2827.

Joseph E. Krakora, Public Defender, attorney for appellant (Peter T. Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Caroline C. Galda,

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Defendant was charged in an Essex County indictment with murder, N.J.S.A. 2C:11-3(a)(1) and -3(a)(2) (count one); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three). He entered a negotiated guilty plea to count one, as amended to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and count two. He was sentenced to a fifteen-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count one, and a concurrent five-year prison term with forty-two months of parole ineligibility on count two.

The convictions stemmed from the June 7, 2018 shooting death of Shamarr Cohen outside a liquor store in Newark. Once defendant became a suspect in the investigation, he was arrested on two outstanding municipal court warrants, advised by homicide detectives that he was going to be questioned

regarding the homicide, and given Miranda[1] warnings. Defendant waived his rights, ultimately gave an incriminating statement, and subsequently opposed the State's motion to admit the statement at trial. After the trial judge granted the State's motion to admit the statement, defendant pled guilty pursuant to a plea agreement and was sentenced in accordance with its terms.

On appeal, defendant raises the following points for our consideration:

POINT I

[DEFENDANT'S] MIRANDA WAIVER WAS NOT KNOWING AND VOLUNTARY BECAUSE THE INTERROGATING DETECTIVE FAILED TO STATE THAT [DEFENDANT] WAS UNDER ARREST FOR THE HOMICIDE, BUT INSTEAD DECEIVED [DEFENDANT] INTO BELIEVING THAT HE WAS ONLY UNDER ARREST FOR MUNICIPAL COURT WARRANTS. U.S. CONST. AMEND. V, XIV; N.J. CONST. ART. I, PARA. 1.

POINT II

[DEFENDANT] SHOULD BE RESENTENCED BECAUSE THE COURT IMPROPERLY FAILED TO FIND MITIGATING FACTOR SEVEN -- THAT [DEFENDANT] HAD "LED A LAW-ABIDING LIFE FOR A SUBSTANTIAL PERIOD OF TIME" -- EVEN THOUGH [DEFENDANT'S] LAST OFFENSE WAS ABOUT ELEVEN YEARS BEFORE THE PRESENT ONE.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Having reviewed the record in light of the applicable legal principles, we affirm.

## I.

We glean these facts from the Miranda hearing conducted on May 9 and 10, 2019, during which Detective Javier Acevedo, assigned to the Homicide Task Force of the Essex County Prosecutor's Office, was the sole witness for the State.

On June 7, 2018, Cohen was shot after purchasing "nip" bottles of alcohol at a liquor store located at the intersection of Roseville and 7th Avenues in Newark. Police found Cohen lying in the grass in front of 379 7th Avenue suffering from an apparent gunshot wound to the head. Cohen was transported by paramedics to University Hospital, where he died the following day. Responding officers recovered a pair of eyeglasses and "nip" liquor bottles at the crime scene.

On June 8, the day after the shooting, Acevedo, who was the lead detective, interviewed an eyewitness who said that he, Cohen, and a man he knew as "Bad News" had been hanging out and drinking on the night of the shooting. The eyewitness described how "Bad News" and Cohen got into an argument and "Bad News" eventually shot Cohen. Acevedo searched Facebook and linked the nickname "Bad News" to defendant. He prepared a photo array

with defendant's photo, and the eyewitness identified defendant as the person who shot Cohen.

During the investigation, Acevedo also obtained surveillance video from the liquor store. The video showed the eyewitness, Cohen, and defendant together in the store about one hour and forty minutes before the shooting. In the video, defendant was wearing black framed eyeglasses. Defendant was also captured on a police officer's body camera returning to the scene about an hour after the shooting inquiring about what had happened. In the body camera footage, defendant was no longer wearing eyeglasses.

Armed with this information, on June 13, 2018, Acevedo directed two homicide detectives from his squad to conduct visual surveillance of the building where defendant was residing and arrest defendant when he "emerged from the residence" on two outstanding municipal court warrants — one for a traffic ticket in Carteret and one for a domestic violence assault charge in Newark from 2009. Shortly before noon that same day, the detectives arrested defendant. Acevedo arrived on the scene soon thereafter and observed defendant under arrest, seated in the back of a squad car.

After pinpointing the location of defendant's apartment, Acevedo returned to his office and prepared an affidavit to support a search warrant application

for defendant's apartment.[2] In the affidavit, Acevedo described the shooting and the evidence gathered up to that point, including the eyewitness' statement and identification of defendant, the eyeglasses and liquor bottles found at the scene, and the corroborating surveillance and body camera footage. Acevedo also averred that he had "probable cause to believe" that the apartment contained evidence of the homicide.

The warrant was issued at 1:11 p.m. and executed at 1:42 p.m. During the execution, .38 caliber bullets and small "nip" liquor bottles that matched the type found at the scene were recovered from the apartment. Defendant was then transported to the prosecutor's office and placed in an interview room where he was interrogated for about two and one half hours by Acevedo and Essex County Prosecutor's Office Detective Anneesha Ford.

Acevedo testified that before the interrogation commenced, defendant seemed "very anxious to talk" about "what happened." However, Acevedo repeatedly told defendant that he could not talk to him without being on videotape. Acevedo delayed commencing the interrogation because he had to strategize and gather items needed for the interrogation, including the standard

---

[2] The apartment was leased by the mother of defendant's girlfriend. At the time, defendant was residing in the apartment in a bedroom he shared with his girlfriend.

<u>Miranda</u> rights form and still photographs from the liquor store surveillance video.

The interrogation began at 4:38 p.m. and was electronically recorded pursuant to <u>Rule</u> 3:17. Both the recording and a transcript of the interrogation were admitted into evidence at the hearing and reviewed by the judge. Although defendant was not handcuffed during the interrogation, an ankle bracelet secured him to a desk.

We detail key aspects of the interrogation for context. At the outset, after introducing himself as a homicide detective and obtaining defendant's pedigree information, Acevedo informed defendant that he was "under arrest for some unrelated warrants." Specifically, Acevedo told defendant he had "an active traffic warrant out of Carteret" and "a simple assault domestic related warrant out of Newark."

After defendant commented that the assault warrant was "old," the following exchange occurred:

> [ACEVEDO:] Okay. I just have to advise you as to why you're under arrest. Okay. That's the reason why you're under arrest.
>
> [DEFENDANT:] Why am I here[?]

[ACEVEDO:] Okay. We're going to get to that. But I have to advise you as to why you're under arrest. Okay. Do you understand that?

[DEFENDANT:] Yes, sir.

[ACEVEDO:] Okay. All right. Now, so in order for us to speak as to why you're here, I'm going to read you your <u>Miranda</u> rights as I mentioned earlier. This is regarding our investigation number H#47-2018. Date of occurrence is June 7th, 2018, approximately 10:50 p.m. at 379 7th Avenue in the City of Newark. . . .

. . . .

. . . I'm going to ask you certain questions regarding a homicide that occurred in front of 379 7th Avenue in Newark, New Jersey. However, before beginning, I will advise you of your rights. Understood. . . .

[DEFENDANT:] Yes, sir.

Using the <u>Miranda</u> rights form, Acevedo then proceeded to advise defendant of his right to remain silent, his right to the presence of an attorney during any questioning, his right to have an attorney appointed if he could not afford to hire one, his right to stop answering questions at any time, and that anything defendant said could be used against him in a court of law. Upon ascertaining that defendant completed the twelfth grade and was able to read and understand the English language, Acevedo asked defendant to "initial" the form, indicating that he was informed of each right. Defendant complied.

A-2238-19

At that point, defendant asked for clarification as to whether he was "only being questioned" or "[being] charged" with the homicide. Acevedo responded, "[y]ou have not been charged with anything. The only reason why you have been detained and have a cuff on your foot is because you have those two active warrants. That's it. Okay." Ford added, "[t]his is simply questioning."

Next, defendant insisted that the simple assault case was "supposed to [have] been done," and protested that he "ha[d] not been in trouble since 2007." The detectives responded:

> [FORD:] Before we get into all of that, you're going to have the opportunity to tell us all that stuff.
>
> [ACEVEDO:] It's just a formality.
>
> [FORD:] It's formalities. We have to make sure that you're covered and make sure that we're covered before we talk about anything.

At Acevedo's request, defendant then read the following statement aloud from the Miranda form:

> I have been advised and I have read the statements of my rights shown above. I understand what my right[s] are. I am willing to answer questions and make a statement. I do not want a lawyer at this time but understand that I may have one at any time I so desire. I also understand that I may stop answering questions at any time. I understand and know what I'm doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

9

Defendant stated he "agree[d] with the statement" and, at Acevedo's request, signed and dated the form, indicating his agreement. Acevedo and Ford also executed the form, which was admitted into evidence at the hearing.

After administering the <u>Miranda</u> warnings, Acevedo told defendant he was "going to ask [defendant] some questions about an incident that happened" on June 7. Defendant responded that he "kn[ew] about the incident . . . because the streets talk." When asked what he knew, defendant stated he had gone into the liquor store on Roseville and 7th Avenue the morning after the incident and the manager had told him that "[t]he kid that [defendant] was talking to about basketball last night got shot."

Defendant told the detectives he was "new around th[e] block" and "everybody [was] looking at [him] like [he was] the suspect," but he had "nothing to do with [it]." Defendant acknowledged that he, the victim, and others were "together" "drinking" "for a little while" on Roseville and 7th Avenue, but insisted that he did not "hurt[] anybody." Defendant reiterated that he had not been in "trouble since 2007," and was adamant that he was "not that type of dude." Defendant then queried, "[t]hat's why I'm asking why am I in here man . . . like all I did was talk to this guy."

10

As the interrogation continued, defendant persisted in denying any involvement in the incident. When Ford explained to defendant that during the course of the investigation, they were "talking to everybody," both suspects and non-suspects, defendant responded, "[b]ut I'm saying ya'll treating me like I was a suspect. Ya'll say I'm not a suspect, but I feel like I'm being treated like one." In response, the detectives reminded defendant that he was under arrest because of the outstanding warrants.

Gradually, defendant divulged more information about his interaction with the victim on the night in question. Defendant acknowledged that he had gone to the liquor store with the victim. Defendant stated the victim "was celebrating" and was "passing out [liquor] bottles" he had purchased at the liquor store to everyone. According to defendant, they were all outside "just drinking" and "chilling." Defendant said he finished drinking at about 10:25 p.m., after which he walked home and "pass[ed] out." His girlfriend woke him at about 11:00 p.m. and told him that "something happened around the corner." When defendant went back to the corner "to see what [was] going on," he gave a police officer his name.

As the detectives confronted defendant with inconsistencies in his version of events, the following exchange occurred:

11

[DEFENDANT:] Am I being charged with this?

[ACEVEDO:] No. I told you, listen, you were detained because you have the simple assault domestic thing . . . that even you said is old.

. . . .

. . . And then you also have Carteret. . . .

[DEFENDANT:] So that's the only thing I got, you know what I mean.

[ACEVEDO:] I said it to you about [eight] times tonight.

When Acevedo asked defendant what he would say if Acevedo had defendant "on video running away . . . at the time of the shooting," the following exchange occurred:

[DEFENDANT:] So you charging me with something I didn't do?

[ACEVEDO:] I didn't say that. Again, this [is the] ninth time. You're not . . . charged.

Defendant continued to deny killing the victim. When Acevedo asked defendant to explain the video evidence, this exchange occurred:

[DEFENDANT:] So I am being charged?

[ACEVEDO:] You're not. Ten times.

[DEFENDANT:] Yo, because I didn't kill that man.

[ACEVEDO:]  Ten times.

. . . .

Listen.  You want me to show you the warrants? I'll show you the warrants.

[DEFENDANT:]  The warrants -- so I got a warrant for murder and this right here?

[ACEVEDO:]  No.

At that point in the interrogation, defendant admitted that he had had an argument with the victim, as a result of which defendant ran away.  Defendant did not remember what the argument was about, but explained that they were "all standing out there and the next thing [he] kn[e]w," the victim was "grabbing on [him] . . . [l]ike he was mad about something."  Defendant said he ran because the other man who was with them "said somebody got a gun."  Defendant denied having a gun or owning a gun.  Defendant insisted that he "didn't shoot" the victim and that the victim "was still standing" when he ran away.

When Acevedo told defendant he had found bullets in his room during the execution of the search warrant, defendant still denied having a gun.  When Acevedo told defendant he did not believe his version, the following exchange occurred:

[DEFENDANT:]  I'm being charged.

13

[ACEVEDO:]  Eleven times.  You want more water?

[DEFENDANT:]  Yes.

[ACEVEDO:]  Listen, You know what.  I'll do this.  I'll go get a copy of the warrant and show them to you.  The ticket from Carteret and the simple assault . . . .  And you tell me if I'm lying.  Everything I said today is the truth.

[DEFENDANT:]  But when I get done here, you know what [I] mean, am I going home?

[ACEVEDO:]  Excuse me.

[DEFENDANT:]  When I get done here, --

[ACEVEDO:]  I don't know what Newark's going to do.  I told you.  They --

[DEFENDANT:]  No, I'm talking about as far as -- I'm talking about as far as this.

[ACEVEDO:]  You're not charged.

[DEFENDANT:]  No, I mean yo, --

[ACEVEDO:]  Let me get a copy of the warrants.

When Acevedo returned with the warrants, defendant stated, "[t]hat's the least of my worries, man.  My worries and all that stuff are on this shit here, man."  Nevertheless, defendant continued to deny shooting the victim or having a gun.  As the interrogation continued, the detectives challenged defendant's denials until the following exchange occurred:

[DEFENDANT:]  So now you saying -- so you are saying ya'll . . . gonna charge me with this.

[ACEVEDO:]  I didn't say that.  I didn't say that.  But, you know, it don't look good when I have to pull the truth out of you.

[DEFENDANT:]  I already gave you the truth.  I told you.

[ACEVEDO:]  I think there's more.

[DEFENDANT:]  You got the camera.  So what ya'll got on them.

[ACEVEDO:]  Again, the camera doesn't tell me your state of mind, what you were thinking.

[DEFENDANT:]  Because I didn't kill that man.  I didn't kill that man.  I gave ya'll -- I told you.

[ACEVEDO:]  Right.

[DEFENDANT:]  So what's going to happen now? Ya'll charging me with this or you know what I mean because like, yo, I didn't do it.  I didn't do it.

[ACEVEDO:]  Okay.

[DEFENDANT:]  So I need to know what's going on.

[ACEVEDO:]  Well, like I said we still have to process you on the warrant . . . .

Defendant continued to deny any involvement in the shooting until the following exchange occurred:

15

[DEFENDANT:]  Can I make a phone call?

[ACEVEDO:]  Yeah.

[DEFENDANT:]  To my grandmother?

[ACEVEDO:]  Yes.

[DEFENDANT:]  Can I speak to my grandmother real quick?

[ACEVEDO:]  Tell me now, I'll let you make the phone call.  You got my word.

[DEFENDANT:]  I ain't going to never see my family, my kids or nothing.

[ACEVEDO:]  What happened out there?

[DEFENDANT:]  It was an accident, man.

At that juncture, defendant disclosed that he and the victim were "talking about sports" and the victim "got offended by something [defendant] said."  The victim pushed defendant and the two started "tussling."  Defendant admitted that he had a .32 caliber revolver "in [his] backside."  During the "tussling," "[t]he gun dropped."  They both "reached for" the gun and "play[ed] tug-o-war" with the gun.  Defendant "g[o]t control of the gun," and the "[n]ext thing [defendant] heard was poof" as the gun discharged and "[the victim] fell."  Defendant ran home and "got rid of" the gun.  He admitted that the bullets recovered from his room were "the same brand . . . bullets that were in the gun that night."

16

After defendant confessed, he asked what he was being charged with. Acevedo responded that he did not know because he had "to talk to attorneys" and "supervisors." The interrogation ended at 7:10 p.m. Later that night, defendant was charged by complaint-warrant with murder, unlawful possession of a handgun, and possession of a handgun for an unlawful purpose. The complaint-warrant was admitted into evidence at the hearing. Acevedo acknowledged that although he considered defendant a "suspect" in the homicide at the beginning of the interrogation, he did not inform defendant of his status as a suspect.

Acevedo also testified that defendant was not threatened physically or verbally during the course of the interrogation. Acevedo admitted that he "may have raised [his] voice" and "challenged [defendant] on some of his inconsistencies," but never disrespected him. Acevedo also stated that defendant was offered food, water, and bathroom breaks, and was not under the influence of alcohol or narcotics when he gave the statement.

Following the hearing, the judge entered an order granting the State's application to admit defendant's statement at trial. In an oral opinion, the judge found Acevedo "to be very credible," and "[his] demeanor throughout both sides of questioning . . . steady." Accordingly, the judge made factual findings

17

consistent with Acevedo's testimony.  Applying the facts to the governing law, the judge concluded that, based on the totality of the circumstances, the State had proven beyond a reasonable doubt that the "requisite" <u>Miranda</u> warnings were given, defendant "waived each and every one of those rights before he made the statement," and defendant's waiver of his <u>Miranda</u> rights as well as his statement were "knowingly," "intelligently," and "voluntarily" made.

In addressing the argument that defendant should have been told he was a suspect notwithstanding the fact that no charges had been filed, the judge stated:

> [R]ight from the beginning of the statement [defendant] was told the reason he was there was to discuss a homicide that occurred last week, which [defendant] acknowledged that he had heard about.  . . . So [defendant] knew right away why the detectives were there and that was to question him about a homicide. And [defendant] was astute enough to realize that . . . and he stated as such that he felt like he was a suspect based on the type of questioning that he had. And to his credit, he's right; he was a suspect.

The judge acknowledged that defendant repeatedly inquired during the course of the interrogation whether he was being charged with the homicide, and Acevedo made a "strategic decision" to delay filing the complaint until after the interrogation.  However, according to the judge,

> there's nothing in the . . . law that indicates that the police cannot strategize to try to see how best they

18

should approach an interview with a . . . suspect, a defendant, a witness, whoever that may be.

I . . . would think that . . . they wouldn't be doing their job if they weren't strategizing to see how best to obtain information from . . . whoever it is they're interviewing.

Relying on State v. Vincenty, 237 N.J. 122 (2019), and State v. Nyhammer, 197 N.J. 383 (2009), the judge reasoned that:

[T]he bright line that the Supreme Court has drawn is whether or not charges have been filed. And charges had not been filed against [defendant] for the homicide. And the detectives had never said that they were, because they weren't. They were . . . about to file them, but they were not filed. And so they never actually lied to [defendant].

And . . . Nyhammer reiterates that there's no obligation by police to inform someone that they're a suspect. So this [c]ourt is bound to follow the law. And my interpretation of those cases is that the police . . . did not violate the rights of [defendant]. They . . . did not deceive him. They . . . did not inform him he was a suspect, although he . . . certainly surmised that he was. And that therefore at least as a matter of per se violation, the [c]ourt does not find that the statement needs to automatically be suppressed . . . .

Instead, the judge considered Acevedo's failure to tell defendant of his suspect status as "one of the many factors involved in the totality of the circumstances." Based on his analysis of the totality of the circumstances and his review of the recorded interrogation, the judge determined defendant's rights

19

were not violated and the "interrogation was properly conducted."  In support, the judge found:

> [Defendant] was provided an opportunity for food, for water, . . . [and] an opportunity to use the restroom.  The questioning was not unduly coercive or intimidating.  . . . [T]here w[ere] no physical tactics used against [defendant].  And it was about a two[-]and[-]a[-]half[-]hour interview, which is not unnecessarily too prolonged in nature.

Further, according to the judge, defendant "clearly understood each of the rights that was presented to him, signed the rights, and seemed to fully understand what was happening.  By his own admissions, he clearly knew that he was a suspect."

On September 19, 2019, pursuant to a plea agreement, defendant entered a conditional guilty plea to count one, as amended, and count two.  See R. 3:9-3(f) (permitting a defendant, with the approval of the court and the consent of the prosecutor, to enter a guilty plea reserving on the record the right to appeal from the adverse determination of any specified pretrial motion); see also State v. Camacho, 295 N.J. Super. 585, 589-90 (App. Div. 1996), rev'd on other grounds, 153 N.J. 54 (1998) ("Although there is no express 'approval' of the court or 'consent' of the prosecuting attorney [as required under Rule 3:9-3(f)], we believe there was tacit approval and consent evident in the record as a

whole."). On November 15, 2019, defendant was sentenced in accordance with the terms of the plea agreement and a memorializing judgment of conviction was entered on November 18, 2019. This appeal followed.

II.

In Point I, defendant argues the judge erred in admitting his statement because "Acevedo's deception about the basis for [defendant's] arrest violated the rule that the arrestee must be told of the charge against him for a <u>Miranda</u> waiver to be valid." According to defendant, the deception included Acevedo's "repeated reassurances that [defendant] was not under arrest for the homicide" notwithstanding the fact that in his search warrant application, "Acevedo had already argued to a judge that probable cause existed to believe that [defendant] had committed the homicide." Defendant asserts that "[t]he deception . . . was so persistent and so integral to obtaining [defendant's] <u>Miranda</u> waiver that no analysis of the circumstances could show that his waiver was knowing and voluntary."

"A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received <u>Miranda</u> warnings, and after he knowingly, voluntarily, and intelligently waived his rights." <u>State v. O.D.A.-C.</u>, 250 N.J. 408, 413 (2022). "The State must prove beyond a

reasonable doubt that a defendant's waiver was valid." Ibid. (citing State v. Sims, 250 N.J. 189, 211 (2022)). "Courts look to the totality of the circumstances to assess whether the State has met its burden." Ibid. "Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a Miranda waiver is valid." O.D.A.-C., 250 N.J. at 421. "They include the suspect's 'education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems,' how explicit the waiver was, and the amount of time between the reading of the rights and any admissions." Ibid. (alteration in original) (quoting 49 Geo. L.J. Ann. Rev. Crim. Proc. 233-36 (2020)).

In State v. A.G.D., 178 N.J. 56 (2003), our Supreme Court held that a Miranda waiver is invalid "when the police fail to inform [a defendant] that a criminal complaint or arrest warrant has been filed or issued against him and he otherwise does not know that fact." A.G.D., 178 N.J. at 58. The Court reasoned that "[t]he government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights . . . regardless of other factors that might support [the] confession's admission." Id. at 68. Although the A.G.D. Court held that the defendant's confession should have

been suppressed because the detectives failed to inform the defendant that an arrest warrant had been issued, the Court stressed that its holding was "not to be construed as altering existing case law in respect of the manner in which the police conduct interrogations other than imposing the basic requirement to inform an interrogatee that a criminal complaint . . . has been filed or issued." Id. at 68-69.

In Nyhammer, the Court considered "whether the failure to advise an individual that he is a suspect at the time he is read his Miranda warnings should be a factor in the totality-of-the-circumstances test." Nyhammer, 197 N.J. at 405. There, law enforcement questioned the defendant about his uncle's role in alleged child molestation without disclosing that he was also a suspect. Id. at 408-09. The Court held that the defendant's statement was admissible and explained that while "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision," "the failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances." Id. at 407 (quoting Colorado v. Spring, 479 U.S. 564, 576 (1987)).

In distinguishing A.G.D., the Nyhammer Court stated:

> This case also is easily distinguishable from
> A.G.D. The issuance of a criminal complaint and arrest

> warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual. The defendant in A.G.D. was purposely kept in the dark by his interlocutors of this indispensable information. Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers. A suspect to one police officer may be a person of interest to another officer.
>
> [Nyhammer, 197 N.J. at 404-05.]

To be sure, "[i]n Nyhammer, our Supreme Court firmly embraced the principle that police are not required to '"supply a suspect with a flow of information to help him [or her] calibrate his [or her] self-interest in deciding whether to speak or stand by his [or her] rights" because "the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature."'" State v. Cotto, 471 N.J. Super. 489, 514-15 (App. Div. 2022) (quoting Nyhammer, 197 N.J. at 407).

In Vincenty, police officers failed to inform a suspect of formal charges filed against him prior to his interrogation, during which he made incriminating statements. Id. at 126-29. The Supreme Court reiterated A.G.D.'s mandate that law enforcement officers "make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed

against him." Vincenty, 237 N.J. at 134. The Court viewed the interrogation in Vincenty to be "precisely what A.G.D. prohibits," as it "illustrates that suspects cannot knowingly and intelligently determine whether to waive their right against self-incrimination if, when making that determination, they have not been informed of the charges filed against them." Vincenty, 237 N.J. at 134.

In State v. Sims, 466 N.J. Super. 346, 367-68 (App. Div. 2021), rev'd and remanded, 250 N.J. 189 (2022), reconsideration denied, 250 N.J. 493 (2022), this court expanded the rule announced in A.G.D. and adopted a new rule requiring officers to tell an arrestee who is not subject to a complaint-warrant or arrest warrant what charges he faced before any interrogation. There, the defendant asserted that his Miranda rights were violated because the police did not tell him why he was arrested. Sims, 466 N.J. Super. at 361. In reversing our decision, our Supreme Court "decline[d] to adopt the rule prescribed by the Appellate Division," reasoning that such an expansion was "unwarranted and impractical." Sims, 250 N.J. at 197, 214.

In elaborating on the impracticality of the rule, the Court stated:

> The Appellate Division's rule relies not on an objective statement of the charges pending against the arrestee, but on an officer's prediction, based on information learned to date in a developing investigation, of what charges may be filed. . . . [E]ven when there is probable cause for an arrest, there may be insufficient

information about the victim's injuries, the arrestee's mental state, and other key issues to enable an officer to accurately identify the charges. An officer acting in good faith might inadvertently misinform an arrestee as to the charges that he will eventually face. We do not share the Appellate Division's conclusion that law enforcement officers can resolve any ambiguities or disputes about charging decisions before a judicial officer has reviewed the showing of probable cause and issued a complaint-warrant or arrest warrant.

[Id. at 215-16 (citation omitted) (citing Sims, 466 N.J. Super. at 381-83 (Susswein, J., concurring and dissenting)).]

The Sims Court underscored that trial courts should continue to use "the totality-of-the-circumstances standard" and that "the root of the inquiry is whether a suspect's will has been overborne by police conduct." Id. at 217 (quoting State v. Presha, 163 N.J. 304, 313 (2000)). Critically, the Court explicitly rejected the defendant's argument that "law enforcement officers will deliberately delay seeking a complaint-warrant or arrest warrant in order to avoid disclosing to an arrestee the charges that he faces." Id. at 216. The Court explained that "[i]n a case in which there is evidence of such bad-faith conduct on the part of law enforcement officers, the trial court should consider such conduct as part of the totality-of-the-circumstances test." Ibid.

Recently, in Cotto, we had the opportunity to apply the Supreme Court's holding in Sims. There, following an investigation of suspected arson at a

nightclub, law enforcement officers identified the defendant as a suspect and determined he had outstanding arrest warrants for traffic violations. Cotto, 471 N.J. Super. at 502, 504. Officers arrested the defendant on the open traffic warrants and transported him to their headquarters, where he was told he was under arrest for the traffic summonses, administered Miranda warnings, and, after waiving his rights, questioned almost exclusively about the nightclub arson for approximately two hours. Cotto, 471 N.J. Super. at 504, 506.

"At the outset of substantive questioning, the detectives explained that they wanted to talk to defendant about something other than the traffic warrants and then immediately directed defendant's attention to the nightclub" by asking the defendant what he had heard about the arson. Id. at 520. When the defendant asked whether he was being questioned about the arson, "the detective asked again what had happened, and [the] defendant answered, 'they said some Mexican dude threw . . . some gasoline.'" Id. at 507 (alteration in original). As the interrogation continued, the defendant persistently denied setting the fire. Id. at 507-09. However, toward the end of the interrogation, when the detectives told the defendant he was going to be charged with aggravated arson, the defendant agreed to "continue to talk about the arson charge" while "imploring the detectives not to charge him." Id. at 510. After the defendant was re-

administered <u>Miranda</u> warnings and waived his rights, he made incriminating statements which the trial court found admissible. <u>Cotto</u>, 471 N.J. Super. at 510, 512.

On appeal, the defendant argued "that the detectives . . . violated his Fifth Amendment rights by failing to inform him during the <u>Miranda</u> waiver colloquy that he was suspected of and would eventually be charged with aggravated arson." <u>Id.</u> at 512. We rejected the argument. We concluded the "police complied with <u>A.G.D.</u>'s per se rule by telling defendant he was arrested for outstanding traffic warrants." <u>Cotto</u>, 471 N.J. Super. at 519-20. We determined "that [the] defendant's constitutional rights were not violated by the fact that police executed those warrants because they wanted to talk to him about the nightclub arson." <u>Id.</u> at 520. We noted "the bright-line notification requirement announced in <u>A.G.D.</u> is triggered only by the actual issuance of an arrest warrant or complaint-warrant, and not by the fact that police have probable cause to support an application for such a warrant." <u>Cotto</u>, 471 N.J. Super. at 518 n.7. We stressed that "although [the] defendant indisputably was a suspect in the arson investigation, because charges had not been filed concerning that crime, the detectives were not required pursuant to a bright-line rule to alert [the]

defendant as to his suspect status during the initial <u>Miranda</u> waiver colloquy." <u>Cotto</u>, 471 N.J. Super. at 520 (citing <u>Sims</u>, 250 N.J. at 210-14).

In specifically addressing the argument that the officers "strategically" chose to arrest the defendant "for the outstanding traffic warrants, without mentioning the arson investigation, to obtain [the defendant's] <u>Miranda</u> waiver and evade the dictates of . . . <u>A.G.D.</u>," we stated:

> [E]ven accepting for the sake of argument that the detectives had probable cause to believe defendant committed aggravated arson before the interrogation commenced, and thus expected and intended to apply for a complaint-warrant charging aggravated arson, we do not see evidence of bad-faith interrogation tactics that violated [the] defendant's constitutional rights.
>
> [<u>Cotto</u>, 471 N.J. Super. at 520.]

In contrast, in <u>State v. Diaz</u>, we disapproved of "the form of deception" that occurred "as part of the waiver process" during an interrogation and affirmed the trial court's suppression of the defendant's incriminating statement, which linked the defendant to a strict liability drug-induced homicide offense. 470 N.J. Super. 495, 502-03, 525 (App. Div. 2022). There, in the course of investigating a homicide resulting from a "fatal heroin overdose," law enforcement officers arrested the defendant leaving his residence. <u>Id.</u> at 502,

531. The defendant had eight bags of heroin on his person and additional heroin inside his apartment. Id. at 531.

Prior to arresting the defendant, police had been advised by the victim's roommate that she had shared heroin with the victim immediately prior to her overdose death, which heroin the roommate had purchased from the defendant the night before. Id. at 504, 530. Additionally, at law enforcement's request, the roommate had agreed to a consensual intercept of a telephone conversation with the defendant during which the defendant had agreed to come immediately to the roommate's apartment to sell her more heroin. Id. at 504-05, 530.

When the defendant was arrested outside his residence and administered his Miranda rights, he was unaware of the overdose death. Diaz, 470 N.J. Super. at 505-06, 508, 530-31. In response to the defendant's "inquiry as to the reason for his arrest," id. at 503, detectives had replied they were "conducting an investigation involving narcotics." Id. at 519. It was not until "approximately fifteen minutes after [the] defendant had waived his Miranda rights and shortly after [the] defendant [had] confessed to selling drugs to [the roommate] the day before" that the defendant learned the investigation concerned the overdose death. Diaz, 470 N.J. Super. at 524.

We noted that "the decision to withhold information about the overdose death . . . was part of a deliberate and designed investigative plan to induce defendant to waive his right against self-incrimination." Ibid. We acknowledged "that police are permitted, within limits, to use trickery or deception in the course of a custodial interrogation." Ibid. However, "[a]ffirmatively misleading an interrogee about the seriousness of the offense for which he or she was taken into custody strikes at the heart of the waiver decision." Id. at 525. We concluded that misleading the defendant "was done pursuant to a planned investigative strategy to elicit incriminating statements linking defendant to the overdose death before defendant became aware that someone had died." Id. at 503. We held that "considering the totality of the circumstances, the State failed to establish beyond a reasonable doubt that [the] defendant knowingly waived his right against self-incrimination." Ibid.

Our standard of review of a trial court's Miranda ruling is well settled. We give "deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence," State v. S.S., 229 N.J. 360, 379 (2017), "so long as they are supported by sufficient credible evidence in the record." O.D.A.-C., 250 N.J. at 425. "But we are not bound by the trial court's

determination of the validity of the waiver, which is a legal, not a factual, question." Ibid.

Here, we are satisfied that the judge's findings of fact are supported by sufficient credible evidence in the record and accord them the deference our law requires. We are also convinced that the judge's application of the totality-of-the-circumstances standard to the facts of the case justified finding a valid waiver and admitting defendant's statement at trial. During the two-and-a-half-hour interrogation, defendant, who had prior experience with the criminal justice system, was read his Miranda rights and waived his rights verbally and in writing. Critically, prior to the waiver colloquy, notwithstanding the fact that defendant had been arrested on "unrelated warrants," Acevedo informed defendant that he was there to be questioned about the June 7, 2018 homicide. There was no requirement for Acevedo to inform defendant that he was a suspect in the homicide investigation and no requirement to inform defendant that he would be charged with the homicide because no complaint-warrant or arrest warrant had been issued for the charge. Additionally, there was no evidence that the detectives threatened defendant, subjected him to mental exhaustion or physical stress, ignored any requests for food, water or bathroom breaks, or acted in any manner to overbear his will.

Defendant relies on this court's decision in Sims to support his claim that the judge misapplied both Nyhammer and Vincenty. However, because our Supreme Court "expressly declined to expand the reach of the A.G.D./Vincenty bright-line rules by requiring police to inform an interrogee of charges that have not yet been filed, regardless of whether the interrogee was a suspect or whether police had probable cause to apply for a complaint-warrant or arrest warrant," Cotto, 471 N.J. Super. at 517 (citing Sims, 250 N.J. at 215), defendant's argument fails.

The gravamen of defendant's argument is that his Miranda waiver was not knowing because the detectives failed to inform him that he was "under arrest for the homicide, but instead deceived [him] into believing that he was only under arrest for municipal court warrants." However, when the interrogation was conducted, no complaint-warrant or arrest warrant had been issued for the homicide. In fact, once defendant confessed, Acevedo told defendant that he did not know what defendant would be charged with because he had "to talk to attorneys" and "supervisors." Although there was no complaint-warrant or arrest warrant issued for the homicide at the time of questioning, the purpose of the questioning was never obscured or hidden from defendant. Thus, in the absence of any evidence of bad faith on the part of the detectives, we reject

defendant's assertion that his <u>Miranda</u> waiver was invalid. Unlike in <u>Diaz</u>, where "the detectives deliberately and designedly misled defendant as to his true legal status by providing a vague and incomplete answer to defendant's inquiry as to the reason for his arrest," 470 N.J. Super. at 503, here, defendant was clearly informed prior to eliciting his waiver that he was being questioned about the homicide.

Defendant was arrested for outstanding municipal court warrants and transported to the Prosecutor's Office for questioning regarding his role in the homicide. He was told prior to questioning that he would be asked "certain questions regarding a homicide that occurred," and the interrogating detectives clearly identified themselves as members of the Homicide Task Force. Defendant was administered his <u>Miranda</u> rights, acknowledged verbally and in writing that he understood his rights, and knowingly, intelligently, and voluntarily waived his rights. Throughout the interrogation, when defendant repeatedly asked whether he was being charged with the homicide, the detectives reiterated that he was only under arrest for the outstanding municipal court warrants. Defendant was not charged with the homicide until after the interrogation was completed. By then, defendant had confessed to the homicide. Reviewing the record critically "and accounting for all relevant circumstances

militating for and against suppression, we are satisfied that the manner in which this custodial interrogation was conducted was lawful and does not offend contemporary notions of justice and fair play." Cotto, 471 N.J. Super. at 523.

III.

In Point II, defendant argues that the judge "made a mistake in failing to find or consider mitigating factor seven," N.J.S.A. 2C:44-1(b)(7) ("The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense."). We disagree.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "[w]hile the sentence imposed must be a lawful one, the [trial] court's decision to impose a sentence in accordance with the plea agreement should be given great respect, since a 'presumption of reasonableness . . . attaches to criminal sentences imposed on plea bargain defendants.'" State v. S.C., 289 N.J. Super. 61, 71 (App. Div. 1996) (quoting State v. Sainz, 107 N.J. 283, 294 (1987)).

Here, based on the risk of re-offense, defendant's extensive prior criminal record, and the heightened need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), and (9). In support, the judge recounted defendant's prior criminal history at length, explaining:

> As a juvenile [defendant had] four petitions and no adjudications. As an adult, [his] first adult arrest was on March 15[], 1996; [his] last arrest was on November 1[], 2015. [He had] been arrested [twelve] times . . . prior to the present offense, not including the present offense. [He had] five indictable convictions; some of them for rather serious crimes. That would be gun crimes.

The judge noted there was "no real evidence to detract from the reasonable likelihood that [defendant] would offend again" because "he's been arrested many times" and "convicted many times."

In mitigation, the judge found defendant's expression of remorse was "sincere[]." However, the judge found the "aggravating factors outweigh[ed]

the mitigating factors." Despite noting that the preponderance of aggravating factors weighed in favor of "a custodial term towards the higher end of the range," the judge sentenced defendant at the midpoint of the sentencing range for a first-degree crime on count one, as amended, and to the mandatory minimum term for a second-degree Graves Act offense on count two, in accordance with the terms of the plea agreement. See N.J.S.A. 2C:43-6(a)(1) to (2); N.J.S.A. 2C:43-6(c); see also State v. Natale, 184 N.J. 458, 488 (2005) ("Although no inflexible rule applies . . . when the aggravating factors preponderate, sentences will tend toward the higher end of the [sentencing] range.").

Defendant argues the judge should have found mitigating factor seven because he "led a law-abiding life for eleven years before the present offense." Given defendant's prior criminal history, we reject defendant's contention and discern no abuse of discretion in the judge's sentencing decision. See State v. Rice, 425 N.J. Super. 375, 382 (App. Div. 2012) ("Adult arrests that do not result in convictions may be 'relevant to the character of the sentence . . . imposed.' A sentencing court, therefore, does not abuse its discretion by refusing to find mitigating factor seven based upon . . . charges that did not result in

A-2238-19

convictions." (first alteration in original) (citation omitted) (quoting State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991))).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION